# EXHIBIT C
**(W. Kitzes's Expert Report)**

| | |
|---|---|
| **IN RE: YAMAHA MOTOR CORP. RHINO ATV PRODUCTS LIABILITY LITIGATION**<br><br>IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY AT LOUISVILLE<br><br>This Document Pertains To:<br><br>All Cases | **MASTER FILE NO. 3:09-MD-2016-JBC MDL NO. 2016**<br><br>Honorable Jennifer B. Coffman |
| **IN RE COORDINATED YAMAHA RHINO LITIGATION**<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF ORANGE -- CIVIL COMPLEX CENTER<br><br>(This Pertains To All Actions) | **JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 4561**<br><br>Honorable Thierry Patrick Colaw, Coordination Judge, Department CX104 |
| **IN RE: YAMAHA RHINO LITIGATION**<br><br>IN THE STATE COURT FOR GWINNETT COUNTY -- STATE OF GEORGIA<br><br>Pertains to All Cases | **Master File No.: 09-C-08254-2**<br><br>The Honorable Randy Rich |

# EXPERT REPORT OF

## WILLIAM F. KITZES, J.D., CPSM

### January 8, 2010

Consumer Safety Associates, LLC   4501 NW 25th Way   Boca Raton, FL 33434
561-241-1900   kitzes@productsafety.com

The following report is preliminary and based on information available to date. The issues described below are subject to change as additional information becomes available.

Background and Experience

I am a Board Certified Product Safety Manager and Hazard Control Manager and hold a Certificate from the Executive Program in Safety Management from the American Society of Safety Engineers. I received a Bachelors degree from the University of Wisconsin and a J.D. degree from American University School of Law. For the past 30 years, I have provided risk assessment and product safety management services to attorneys, corporations and government organizations.

From 1974 to 1981, I worked at the U.S. Consumer Product Safety Commission (CPSC) and began my full time service as *Legal Advisor to the Director, Office of Product Defect Identification*. I was responsible for identifying product defects which "could create a substantial product hazard" and implementing recalls and corrective action plans under Section 15 of the Consumer Product Safety Act.

As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer product injuries. Injury prevention tools included mandatory and voluntary standards, on-product warnings and safety education campaigns. I lead the development of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*. I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI) and the American Society for Testing & Materials (ASTM).

2

I have been retained as a consultant for a number of national companies, including ***Arctic Cat***, a major manufacturer of off road vehicles, where I consulted in safety performance, risk assessment and the development of on-product warnings and the operator's manual.

Other consulting assignments have included, but are not limited to, the ***Toro Company*** on product safety issues, the ***Vendo Company*** for developing warning labels and safety bulletins, the ***Jensen Corporation*** for warnings and safe operation of industrial equipment, and ***BernzOmatic*** for recall analysis and development of point-of-purchase consumer information displays. I developed a program for ***Global Industries*** to improve executive chair stability, reviewed warnings on heavy equipment for ***Daewoo Heavy Industries America***, and assisted ***CISCO Systems*** in the worldwide recall of internet communications devices. I designed a warning label for ***Whisper Communications, Inc.*** and provided risk analysis, recall assistance, warnings and instructions for ***Restoration Hardware, Inc.*** I developed warning labels for ***Plastics Research Corp.*** and assisted ***Hilton Hotels*** in product safety management. I assisted ***Swimways Corporation*** on compliance with the Consumer Product Safety Act and advised ***AsiaEXP*** on risk assessment, labeling and product standards. I provided research and analysis on ATV safety for the ***National Association of Attorneys General*** and served as the Chairman of the ***Florida Consumer's Council*** (1993-2007).

I have presented analyses on injury prevention, risk assessment, warnings and recalls at annual meetings of the ***National Safety Council*** and conferences presented by the ***International Consumer Product Health and Safety Organization*** and the ***Consumer Product Safety Commission***. Articles authored in professional journals on risk assessment and safety management include "ATVs -- The Hidden Danger," <u>Journal of Law, Medicine, & Healthcare</u>, World Health Organization (WHO), Spring 1989.

<u>Product Safety Management</u>

Product safety management is a system that a reasonably prudent manufacturer puts in place <u>before</u> the first product is conceived to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe. It starts with a statement of commitment for product safety from top management and develops a company's procedures to <u>identify hazards</u>, <u>assess the risk</u>, <u>apply adequate safety measures to eliminate hazards</u> from the design, places a <u>guard between users and potential injury</u> and to <u>warn users of all hazards</u> that have not been eliminated or adequately guarded through technically feasible and economically practical safety measures.

To ensure that product safety management programs are in place, a product safety audit as outlined by the National Safety Council can be used to <u>test</u> the validity of the company's program and to identify the <u>objective techniques</u> to be applied. Once established, ensuring that the required elements are incorporated in the plan is generally not prone to error. Although the application of documents and data may be subject to discussion, the actual principles are well established in the literature.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. As can be shown from the wide dissemination and acceptance by academia, business and legal professionals, their concepts are widely used and accepted throughout the safety community. (See attached bibliography)

Safety management is primarily a tool to protect consumers before they purchase products. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating product safety, it is incumbent upon a reasonably prudent manufacturer, importer, distributor, and retailer to apply the following accepted principles of safety analysis to insure that the products are reasonably safe.

1.    <u>Establish and observe a written safety policy</u>.  This policy should emphasize commitment to safety.  In writing, it will insure all employees obtain clear guidance on safety issues.  The policy should set forth a method for discussing safety responsibilities.

2.    <u>Adequately identify and evaluate product hazards</u>.  A hazard is the inherent capability of a product to do harm.  Manufacturers, distributors, and retailers must review the potential injury-causing energy and evaluate severity and foreseeability.

3.    <u>Perform an adequate risk assessment integrating product hazards, the environment, and foreseeable consumer use</u>.  Once hazards are identified, the reasonably prudent manufacturer/distributor/retailer must consider the conditions of use under which the injury-causing mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used, especially in light of product promotion, is critical in discerning how the consumer may foreseeably use the product, even if it is not the use intended by the manufacturer.

The product must be reasonably safe prior to distribution in commerce.  If it is not possible to eliminate the hazard, the reasonably prudent manufacturer, distributor, and retailer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

4.    <u>Monitor the safety performance of the product after sale and use, and take corrective action where necessary</u>.  Once products are distributed to consumers, a responsible manufacturer/distributor/retailer must determine where injuries can occur, or if a product defect (including lack of adequate labeling and safety information) could

create injuries. Where corrective action is needed to substantially reduce or eliminate injuries, consumer notification and additional corrective measures must be implemented to insure consumer safety.

5.    <u>Develop adequate warnings and training to motivate consumers to understand and avoid dangers</u>. This is critical and relatively inexpensive. When consumers have sufficient data to make an informed decision about safety, they are in a better position to address safety issues.

*       *       *       *       *

A key precept of safety management concerns products with inherent capability to do catastrophic harm. In priority order, the duty of a reasonably prudent manufacturer is to <u>eliminate the hazard</u>, or, if this is not possible while preserving utility, <u>guard against the hazard</u>. At a minimum, the manufacturer must properly <u>inform users of the danger inherent</u> in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

- Eliminate hazards

- When hazards cannot be eliminated, provide feasible safeguards against them

- Provide warnings and personal protective equipment against remaining hazards

<u>National Safety Council</u>
<u>Product Safety Management Guidelines, 1989</u>

\*        \*        \*        \*        \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*. The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1.      Executive interest and support
2.      Cause-analysis
3.      Selection and application of remedy
4.      Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices. Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission (CPSC) identified modern safety principles in its 1975 publication, <u>Handbook and Standards for Manufacturing Safer Consumer Products</u>. The Commission addressed executive action, design review, risk assessment and corrective action.

> Design review consists of identification and evaluation of potential safety hazards against pre-established criteria appropriate to the product. It is particularly important that these criteria include objective projections of the conditions under which the product is used, including recognition of the age levels and physical limitations of users, and contingencies that might occur as a result of misuse or abuse of the product. It is advisable that the criteria distinguish substantial safety hazards from product deficiencies that do not involve risks of injury or impairment of health.

Updated in 2006, the Handbook states that "Manufacturers must assure the safety of consumer products" and identifies the elements of a comprehensive system approach to achieve that goal.

Opinions

1.     Yamaha failed to act as a reasonably prudent manufacturer to adequately protect owners and operators from the catastrophic risks of injury associated with the foreseeable use of the Rhino.

2.     Yamaha failed to apply the accepted principles of product safety analysis to adequately:

- Establish and observe a written corporate safety policy
- Identify product hazards and evaluate severity
- Perform a risk assessment to adequately integrate product hazards, the environment and foreseeable consumer use
- Monitor the safety performance of their product to take adequate corrective action to substantially reduce or eliminate the risk of injury.

A Systems Approach to Developing Safer Consumer Products and 10 Principles of Safety Management are attached.

3.     Yamaha was well aware of the potential for the Rhino to roll or tipover during foreseeable conditions of use.  Yamaha promoted the Rhino specifically for use on "extreme" environment through its broad definition of "terrainability."  The Rhino creates an unreasonably dangerous condition under foreseeable conditions of use.

4.      With knowledge of at least 20 rollover incidents prior to initial distribution including some which resulted in injury to their own employees, Yamaha managers apparently cut 8 months off the Rhino development period, eliminating the "challenge" at the end of the process to assess the risk and evaluate the potential dangers associated with the Rhino before sale to consumers.

5.      Application of doors to substantially reduce or eliminate injury was considered during pre-production and reviewed in March of 2006 when John Zellner's powerpoint presentation to Yamaha executives in Japan identified a significant potential for injury reduction.  Yet Yamaha's initial evaluation of doors was described in the deposition of Eiji Kato as undocumented "thinking" about the potential for operators to avoid seat belts and helmets and for driving on pavement.

6.      Yamaha failed to apply the established hierarchy of safety management to first eliminate hazards to substantially reduce the risk of injury, then guard against injury by placing a barrier between the operator and the hazard.  After all reasonable attempts to eliminate or guard, a reasonably prudent manufacturer must warn users of the danger and motivate them to avoid injury.  Yamaha implemented the system backwards, substantially delaying the reduction of injuries through available known safety measures such as the application of doors and added stability.

7.      Yamaha failed to disclose to riders the severe and substantial risks of injury associated with the foreseeable use of the Yamaha Rhino.  According to Takanori Suzuki, project leader for the Rhino, there can be a rollover, even under 20 mph, depending on steering, acceleration and surface.  Yamaha's initial label and owner's manual identifies rollover conditions only during sharp or high speed turns.  Subsequent labels added aggressive or abrupt maneuvers.  Riders were deprived of the information that slow speed turns on flat terrain can cause a rollover leading to substantial injury.  Emroy Watson, product liability counsel to Yamaha, stated in his deposition of November 17, 2009, that manufacturers should disclose information about product hazards.  Yet he stated that actions taken during rollovers are involuntary, and cannot be warned against.

9

8.     Yamaha failed to comply with the provisions of the American National Standards Institute (ANSI) Z535.4 Standard for Product Safety Signs and Labels. Yamaha failed to apply the accepted risk assessment procedures embodied in both the ANSI and International Standards Organization (ISO) standards, guidelines and technical reports to develop reasonably safe products.

9.     Yamaha failed to report to the Consumer Product Safety Commission (CPSC) under Section 15 of the Consumer Product Safety Act (CPSA) [15 USC 2064] and the regulations at 16 CFR 1115 that they had obtained information that reasonably supported the conclusion that the Rhino "contained a defect which could create a substantial product hazard" or that it posed an unreasonable risk of serious injury or death to riders.  Yamaha's knowledge of such information was obtained prior to distribution of the Rhino to the public, and included rollovers and injuries to Yamaha employees.  After Yamaha began sales of the Rhino to consumers, additional information concerning rollovers and injuries was quickly obtained that should reasonably lead to a report.  The regulations encourage manufacturers not to delay reporting in order to determine with certainty the existence of a defect before contacting the Commission.  In fact, there is no requirement that a manufacturer admit that a defect exists.  Certainly no later than, and by many measures well before the end of 2005, when Mr. Suzuki admitted to knowledge of 20-30 rollovers and recommended contacting John Zellner to analyze Rhino injuries, Yamaha had adequate information to report.  Yet Yamaha failed to do so repeatedly through September of 2008, when the CPSC, because of Yamaha's failure to report, opened a staff initiated Section 15 defect file.  Yamaha failed to implement an adequate recall and voluntary corrective action plan in a timely manner.

**Yamaha's Corporate Philosophy**

As a company that makes the world its field and offers products for the land, the water, the snowfields and the sky, Yamaha Motor strives to be a company that "offers new excitement and a more fulfilling life for people all over the world" and to use our ingenuity and passion to realize peoples' dreams and always be the ones they look to for "the next Kando."

Kando is a Japanese word for the simultaneous feeling of deep satisfaction and intense excitement that people experience when they encounter something of exceptional value.

Yamaha-Motor.co.jp

Risk Assessment Procedures

In his deposition in Wells v. Yamaha, Eiji Kato, Rhino project leader for Yamaha Motor Manufacturing Company (YMMC) in Georgia, testified that by the end of 2003 (prior to the sale of the subject Rhino), Yamaha had obtained an unspecified certification from the International Standards Organization. Generally, to obtain such certification, a company must submit an application and request an inspection and compliance evaluation. The following ISO guidelines concerning standards development for technical groups and standards for machinery provide a framework that a reasonably prudent manufacturer can use to assess product risks and develop preventative actions to manufacture and sell a reasonably safe product.

ISO / IEC Guide 51 (1999) -- This document outlines the safety aspects of standards development for technical groups when developing product safety standards. It covers hazards, risks, intended use and reasonably foreseeable misuse. It includes flow charts for a manufacturer to follow in risk assessment and risk reduction programs.

ISO 9001, 9004  Quality Management Systems (2000)  -- These standards provide a certification process and "form a consistent pair of standards on quality management."  In addition to incorporating most of the requirements described above, the standard calls for control of "nonconformities both during the development process and after delivery or use."  It states that an organization shall identify sources of information to determine the cause of nonconformity and develop corrective action.  Finally, a documented procedure shall be established to eliminate causes of potential nonconformities and prevent their occurrence.

In 2003, Espec Corporation of Japan published Technology Report 15, titled ISO International Safety Standards:  Contents and Trends.  The report is authored by Kunihito Sato of The Society of Safety Technology and Application, Japan.  He describes the application of the ISO / IEC Guide 51 discussed above.  He states that the guidelines provide a "basic frame of reference for everyone involved in all aspects of safety."  He further states you cannot have safety completely without risk.  Removing the absolute from the definition of safety makes it possible to manage the safety process.  "However, this concept must be restrained by an ethical system that places a high value on human life.  Grave risk cannot be tolerated.  It is crucial to have a strong awareness that even small risks cannot be treated lightly."

In the year 2000, the American National Standards Institute published Technical Report (B11.TR3-2000) on risk assessment and risk reduction for machine tools in conjunction with the Association for Manufacturing Technology.  The report defines reasonably foreseeable misuse as the predictable use of a machine in a way not intended by the supplier but which may result from human behavior.  It states that behaviors that should be taken into account in a risk assessment include the reflexive behavior of a person in case of a malfunction, incident or failure during use.  The report reiterates that a small number of injuries in the early years of distribution does not necessarily equate to a low risk of injury.  The report includes a Risk Estimation Matrix

for use by manufacturers and distributors to identify the level of risk associated with the use of their products.

Modern safety management theory and the application of risk assessment principles have been the subject of safety analysis for over 50 years. A Systems Approach to Developing Safer Consumer Products and the 10 Principles of Product Safety Management provide a format to apply those guidelines to reduce the substantial risks of injury associated with the foreseeable use of the Yamaha Rhino.

Yamaha Promotion and Foreseeable Use

Yamaha promotion, advertising and video portray the Yamaha as tough, stable and capable of extreme "terrainability," traversing challenging and difficult terrain. The video depicts successful riding on rough terrain with no indication of the potential for rollover or tipover, in contrast to the knowledge developed by Yamaha in the course of development. In the video "Mike Martinez Day Off" the Rhino climbs a rough trail apparently moving quickly to what seems to be a chant of "Go-Go-Go" and appears to slide upon initial acceleration in the damp trail.

The Yamaha "Outdoors" video describes the initial development of the Rhino 660 at YMMC's facility in Newnan, Georgia. The video makes a number of handling and stability claims:

- Tested tough, engineered tough
- Push ourselves and our machines to the limit
- Most exhaustive real world testing you can imagine
- Most grueling testing you can imagine
- 4 wheel drive for when the going gets totally aggressive
- Rough terrain is tamed
- Torque-wrenching acceleration

The accompanying visuals paint an equally "to the limit" picture:

- Up rough and steep hills
- Fast, tight turns
- Wheels starting to come up off the ground
- Over large rocks and uneven terrain

And ultimately, Yamaha claims that it is "all about the customer," and that "customer satisfaction is what matters."

The Yamaha powerpoint presentation of the Rhino 660 Turkey Hunt in Concan, Texas, March 29 - April 1, 2004, illustrates Yamaha's promotion of the Rhino and demonstrates their expectation of the Rhino operating environment.  Extreme Off Road capability of the Rhino SxS is the theme.  Along with pictures showing difficult terrain, the slide <u>SxS Market</u> Usage Segmentation, shows the Rhino alone at the farthest reaches of Extreme Off Road use.

## Yamaha Pre Production and Owner Notification

The documents summarized below, published between June of 1999 and August of 2007, represent just a small sample of the material produced by Yamaha covering the Rhino development period.

June 3, 1999 <u>Memo to Ike Miyachi</u>

This early memorandum identified the target customer as an older hunter or ATV rider and promoted a vehicle that can "go anywhere."  It is sized to fit in the back of

a full size pick-up truck.  Terrainability, utility and easy operation to increase passenger safety feeling are identified.  Increase passenger safety feeling.

Dec. 9, 1999  <u>NGV Wrap-up Meeting Minutes</u>

       Two prototypes are evaluated, both the YMC NGV and the YMMC NGV, and both are rated more stable than the other.  The YMC needs improvement in body roll, high CG unstable feeling and tippy.  It is important to make passengers feel safe and to be able to go anywhere you want for fun and hunting by younger customer.  The YMMC is for use where ATVs are ridden and for aggressive trail riding.  It needs improvement in seat too high, CG feeling, roll, unstable, the seat belt and the importance of going anywhere you want.  The Kawasaki Mule was evaluated as stable enough, body roll OK, as a utility.  It is said to be too slow, with poor steering and it is not fun.  Seat belt holding is no good.

Aug. 22, 2001    <u>Email from Pat Williams to Joel Cheek</u>
                     <u>NGV Comments and Observations</u>

- Comments based on attendance at Turkey Bay

- Primary accidents involving injuries are likely to be from rollovers /tipovers.

- Rollovers can lead to the following injuries (not comprehensive)
  - Arm and wrist injuries from contact with ground due to belted occupant attempting to support themselves and/or vehicle during rollover /tipover

  - Ankle and lower leg injuries from contact with ground and vehicle during rollover/tipover as belted occupant attempts to support themselves and/or vehicle during lateral rollover /tipover (this may be #1)

  - Headstrike with ground from belted occupant during lateral rollover /tipover

- The following areas should be addressed

  - Foot restraint or guard which will help prevent the occupant's foot from coming out accidentally during tipover

  - Must not be large that it becomes a tripping hazard

  - Warning concerning seat belt, holding on, keeping arms and legs inside and never stick your arm or leg out in the event of a rollover

  - Passenger handholds

Aug. 31, 2001     <u>Engineering Meeting Minutes Project 01J (NGV)</u>

- Accessories: cab - YMUS

July 16, 2002     <u>01J Meeting Minutes</u>

- Everyone concerned about too much weight up high

Aug. 1, 2002     <u>Model Review Meeting 01J (5UG1)</u>

      The model review raised concerns about the seat belt retractor causing serious injury in a rollover and body roll is too much at high speed. At least eight (8) rollovers were identified. Stability and the center of gravity were considered a big problem and while everyone likes to "spin out," it increases the chance for rollover.

Sept. 12, 2002     <u>Model Review--Meeting Minutes 09/12/02</u>

      Casey Yosida, President of YMMC wants an update on stability of the vehicle for further liability cases.

Mar. 10, 2003      <u>01J Meeting Minutes 3/10/03</u>

         In evaluating the new seat belt, a possible future problem with slow roll was identified.

June 22, 2006     <u>Yamaha Employee Incident Form</u>

- Body Part injured -- Knee, Arm
- Take to hospital
- Passenger on 5UG
- Coming around curve on track no more than 5-10 mph
- Tire must have hit rut causing 5UG to tip over
- Wearing helmet and seat belt
- Preventative Actions

  - Most effective
  - Engineering Controls
  - Warnings  Signs
  - List Actions - (not legible)

June 22, 2006     <u>Yamaha Warning Label Options</u>

- Options for September 2006 warning label pictorial
- Option 1 -- Rollover on flat, level ground
- Option 2 -- Rollover on sloped, uneven ground
- Option 2 chosen for label

Sept. 11, 2006    <u>Yamaha Letter to Owners enclosing warning label</u>

- Warning label states You could be severely injured if you try to stop a vehicle tipover using your arms and legs

- It states only slopes, uneven terrain and turning too fast or sharp increases the risk of tipover. Even its pictorial indicates a significant slope. Rollover on flat terrain at moderate speed is not addressed.

June 4, 2007    <u>David Murray to Mark Kumagai (CPSC)</u>

- The Yamaha folks appreciated your visit and interest in the Rhino product line and production and testing facilities.

- We will also report back later this Summer on the status of the design changes and features that are being considered and tested for model year 2008 Rhinos.

Aug. 24, 2007    <u>Letter from David Murray to Mark Kumagai (CPSC)</u>

- As Roy reported during our meeting, Yamaha is introducing new side panel doors and passenger hand holds.

- These features were being developed and tested when we discussed them during your visit to Yamaha's facility on May 30, 2007.

Aug. 27, 2007    <u>Yamaha Letter to Rhino Owners</u>

- Yamaha has been reliable and versatile. Some operators have engaged in aggressive driving or made abrupt maneuvers that have resulted in side rollovers -- even on flat open areas

- Unfortunately some occupants have been seriously injured during such rollovers when they put their arms and legs outside the vehicle resulting in crushing or other injuries

- Special offer to Rhino owners of new doors and additional passenger handholds

- Designed to keep occupant's arms and legs inside the vehicle, may
  enhance passenger stability and comfort

- Also enclosed is adhesive on-product label

—————————————————————————

June 29, 2007    <u>Deposition of Takanori Suzuki in Gay v. Yamaha, vol. II</u>

- First received notification concerning customer complaints
  related to leg injury in a rollover 2004

  Early in 2007, heard there were about 50 cases but probably more
  since then.  Majority of them leg injuries

- I fully understand that the presence of a door will make it more difficult
  for the leg to stick out but there are drawbacks, pros and cons

  So at this time we have taken the measure of attaching a label to remind
  customers not to stick out their legs

- Even at under 20 mph on flat ground, depending on steering or
  acceleration or surface, there can be a rollover

- Other than the warning there's been no change in safety from mid-2004

<u>Zellner Report</u>

The Yamaha commissioned report "Analysis of Foot Restraint Devices for
a Side by Side Vehicle" by J. W. Zellner, issued on 15 March 2008, states that Mr.
Zellner's evaluation, done in a series of phases, between January of 2006 and November
of 2007 concluded that:

> The simulation results for "15 to 20 mph, flat turn, one
> quarter roll" overturns, however, revealed that the sculpted
> door had statistically significant injury benefits for the head,
> chest, abdomen, legs and total body during such overturns.

He states these benefits accrue where helmets and/or seat belts are in use.  He further
states that:

> If all Rhinos were subjected only to "15 to 20 mph, flat-turn,
> one quarter roll" overturns with helmeted and belted dummies
> then the sculpted doors would tend to decrease leg and head
> injuries as well as total body injuries.

In Mr. Zellner's deposition in <u>Sturgeon v. Yamaha</u> of November 6, 2008, he further states
that without doors, such rollover events would cause a 100 percent chance of leg injury if
the occupant extended their foot out in that sort of event.

Yamaha failed to provide adequate safety measures such as doors to protect
users from exiting the vehicle during rollovers under foreseeable conditions of use.
Yamaha failed to provide adequate safety measures to substantially reduce the risk of
vehicle rollovers during foreseeable conditions of use.  Even before initial distribution,
Yamaha claims to have considered doors for protection of occupants, yet did not want to
depart from the "open-air" feeling of the Rhino.

<u>Yamaha Deposition Testimony</u>

The depositions of Yamaha managers and test riders provide insight into Yamaha knowledge of the risks associated with the foreseeable consumer use of the Rhino, especially in light of Yamaha's promotion of the broad range "terrainability" of the Rhino.

Eiji Kato
Rhino Project Leader (YMMC)

<u>Grimes v. Yamaha</u>  (Nov. 17, 2005)

- If by any chance there is a rollover, this support roof preserves occupant space.
  If the vehicle rolled or tipped, the driver or passenger would be retained completely within the vehicle

- It is a possibility for a passenger or driver's leg to leave the confinement of the vehicle when it rolls or tips, not withstanding the foot plate, the seat belt, the design of the seats, all of the things you mention to keep the person in the vehicle

<u>Wells v. Yamaha</u>  (Oct. 19, 2006)

- Rollovers did occur 6 or 7 times

- We have not done specific tests where we have set such vehicle speed and made specific kinds of turns

- Did FMEA to test possibility of injuries from door but there is no documentation
  The work was done in one's mind

- Did not test possible injuries if door or half door was utilized because we could conceive adverse effects of such features
  In other words, one may forego wearing seat belt or helmet

- Thought if we provided a solid door, one may think it is going to be safe because there is a door

- If the rollover or tipover occurred during testing at or near the vehicle's limit or due to a driving mistake,  then I believe that the chief of testing group would determine that it is not necessary to report such incidents

- I believe that YMMC was ISO certified at the end of 2003

Holt v. Yamaha vol. I  (Feb. 25, 2009)

- We asked Mr. Miyachi what happened, he said he stuck his leg out intentionally
  We thought that an improvement to make it more difficult for someone to intentionally stick the leg out

- In doing your risk assessment, did you give any consideration to what would happen to an occupant's leg if it wound up underneath a 1000 lb. vehicle?
  No, I was thinking about the possibilities.  I was thinking that there might be a possibility of a leg out

- In the thousands of hours of our testing, we found that the occupant remained in the vehicle, so although we considered there was a possibility, in fact there was no such incident from what we experienced

- No written document that describes rollovers to determine whether an occupant in a vehicle being tested whether or not their legs came out or not

- The test report says there were some rollovers, since there are no details, I understand that to mean there was no problem

- The absence of information about the rollovers means there was no problem in regard to occupant's leg either being ejected or stuck out during the rollover

- We believe this was a new category vehicle based on our concept of the vehicle being able "to go anywhere ATVs go" and also based on our concept that this would be an open air vehicle

- The absence of doors was not part of the concept of an open air vehicle

- There were no tests about the minuses of doors, it could be thought out clearly so it wasn't even necessary to make doors

- Basically, thinking in one's head is equivalent to evaluation

Michael J. Martinez
General Manager ATV's and Side by Sides (YMC)

Grimes v. Yamaha  (Dec. 15, 2005)

- I think this type of vehicle came mostly from marketing, mostly from me

- Safety is something the engineers would worry about, not marketing

- When you drove it, you could feel the outdoors, you could see out of it very well
  You didn't feel all enclosed

- Cannot specifically recall any discussions about safety during the concept vehicle

- No discussions during concept vehicle about stability

- Conceived of the fact that the vehicle would have to be designed to go over some pretty rough terrain

- "There is -- there was a good likelihood that someone would tip it over, yes"

- A person could assume that if he got on it and drove it around, they would be able to get off it in one piece

23

Test Riders (YMMC and YMUS)

### Grimes v. Yamaha (June 8, 9, 2006)

- Probably tipped the Rhino over about 10 times during testing
  Aware of other test riders who tipped over the Yamaha (McRae)

- Tipped over twice in a Rhino
  Made a mistake that I tried to correct,
  I ended up spinning sideways because I over-corrected (Chesser)

- Believe the Yamaha Rhino can tipover
  Developed that opinion from the beginning (Langley)

Chad Buckhalt
Yamaha Test Engineer

### In Re:  Yamaha Rhino Litigation  (June 22, 2009)

- Yamaha test engineer

- Injured driving a Rhino, December 2003

- Did not intend to roll

- Did not read dash sticker

- Seat belt, training, experience, age, skill did not prevent foot
  from coming out

- Decided to put foot out to keep vehicle from tipping

- Safety more important than open feeling

- Nothing to prevent foot from getting outside the passenger compartment

Gil Edwards
Yamaha Test Engineer

<u>In Re:  Yamaha Rhino Litigation</u>  (June 30, 2009)

- Doesn't always wear helmet or over the ankle boots

- Rode on pavement at YMMC

- 3-15 rollovers

- Hurt foot during test, put foot out to prevent tipover

- Foot guard did not prevent foot from coming out


Paul Edward Hayes

<u>In Re:  Yamaha Rhino Litigation</u>  (Dec. 5, 2009)

- Eliminate the challenge part of the schedule

- Start production in June 2003 rather than February of 2004

- Reduce the schedule by 8 months to meet marketing needs for the fall 2003 hunting season


Ike Miyachi
Vice President, Rhino Development and Quality Assurance (YMMC)

<u>Grimes v. Yamaha</u>  (Sept. 8, 2006)

- From the very beginning of the planning stage, we anticipated it was possible for the Rhino to tipover because it is an off-road vehicle

- Never tested Rhino to see what would happen to a driver's body by intentionally tipping a Rhino

- Rhino was not developed only for people who had motorcycle riding experience
  Yamaha expected to sell Rhinos to people who had no off-road riding experience

- In the early stages we considered a door
  It was never tested
  Other disadvantages including an occupant being less inclined
  to wear helmet or seat belt

- Can't test a person not wearing a helmet or seat belt because it is related to our anticipation or imagination

- We considered from total enclosure to none

- Since it's an off-road vehicle, we thought there was a possibility of tipover and foresaw people would intentionally stick their legs out in the event of a tipover of a Rhino

- We foresaw if someone intentionally stuck their leg out during a tipover they could get injured

- On flat grassy surface, was there any driving maneuver you could envision that could tip over a Rhino when operated within the confines of its abilities?

- I cannot answer because I do not know what the conditions are
  The situation is general, the range is broad, but I think that the possibility is still there

- We did not conduct tipover tests but they occurred during endurance testing

Emroy Watson
General Manager--Legal (YMUS)

### Grimes v. Yamaha (Oct. 25, 2005)

- Do not forward complaints to engineering or product safety department
  They stay with me
  If need be, I would have discussions with people about a particular litigation if it is unusual or different

- Majority of claims involve lower extremity injuries either to driver or passenger

- We looked at issue of protection for lower extremities in the phase of design and development
  Spoke to Mr. Kato

- Not aware of us ever wanting to put doors or offer it as an accessory
  Not the intended goal
  Intended to be open air and convey that openness

- Doors change the concept and use

### Wells v. Yamaha  (Dec. 15, 2006)

- Some people were saying, in accident information from customer relations, that in a rollover or tipover, they were placing legs outside the Rhino in an attempt to prevent the tipover

- We knew from the beginning some people would not wear helmets
  I talk to people and they tell me reasons why they're not wearing helmets

- We know why people wear helmets and why people don't wear helmets
  and we've known that for a long time

- I'd recommend wearing a helmet even if a person were to drive across a vacant lot
  Do people always do it?  Absolutely not

- Motivation why people wear helmets is different
  Generally what I've seen is if people are doing really aggressive riding, they'll wear helmets

  If they're just moving from point A to point B, they're not going to wear helmets and they're going to say it's inconvenient or hot

- If the dealers move vehicles from the warehouse to the showroom, my general impression is you wouldn't see a lot of helmet use

  I think seat belts always need to be used
  Some customers do, some customers don't
  They have reasons for it

- Driving a Rhino on grass or a dirt lot, it does not turn over
  I'm certain I could

- If you drive it in a reasonable fashion on flat grass or flat dirt, it's not going to tipover

Gay v. Yamaha (Aug. 6, 2007)

- We talked about doors from the beginning

Swainston v. Yamaha (Feb. 25, 2009)

- The Rhino is safe with or without a door

- It's not a misuse to drive it without doors

- It's not the position of the company to say Don't drive a Rhino without doors

Holt v. Yamaha vol. I & II (Feb. 12, 13, 2009)

- Final spec in 2002, no doors

- Doors were discussed, marketing wanted easy in and out

- Concept finalized, no more discussion about doors

- August 2007, doors customer issue not vehicle

- Recognized early on that some people might stick their leg out

- ATV accidents similar to Rhino

- Mr. Suzuki determined it was better to have doors

Takanori Suzuki
Rhino Project Leader (YMC)

Gay v. Yamaha   vol. I & II   (June 28, 29, 2007)

- So if I add up all the rollovers, there would be about 20 in all

- There are all kinds of rollovers and what happens to the body parts
  of the driver depend on what kind of rollover it is

- First received notification concerning customer complaint related to leg
  injury in a rollover 2004
  Early in 2007, heard there were about 50 cases but probably
  more since then
  Majority of them leg injuries

- I fully understand that the presence of a door will make it more difficult for
  the leg to stick out but there are drawbacks, pros and cons
  So at this time we have taken the measure of attaching a label to remind
  customers not to stick out their legs

- Even at under 20 mph on flat ground, depending on steering or
  acceleration or surface, there can be a rollover

- Other than the warning there's been no change in safety from mid-2004

- The door is very effective in making it more difficult for the legs to go outside the vehicle, but it has drawbacks

- When I spoke to riders at Glamis, there was likelihood of rollover, it was more frequent and the presence of a door made it difficult for the leg to come outside the vehicle

Sturgeon v. Yamaha  (May 23, 2008)

- In July of that year, learned that with helmets and seat belts, doors could be effective in this type of accident mode

- Configured door which was difficult to rest hands and legs on and would not hide hip area

- Told Mr. Shiraishi that this type door would have more plus than minus because it would be effective in reducing certain injuries

- In 2006 I learned or knew that many customers experiencing leg injuries
  Learned that there were rollovers
  I felt there would not be rollover unless the vehicle was driven aggressively

- 20 rollovers during testing

- Members operate and drive vehicles from viewpoint of ordinary customers and drivers who have common sense, but also at extremes

- Depending on terrain there could be a stone on the terrain suddenly, so the vehicle may tilt, slip and roll because it was slippery

- There are such instances but these are not aggressive or abrupt
  If used in ordinary way, there would not be a rollover

- The door would be effective when the occupant is intentionally sticking his leg out at the time of a rollover

- Referring to Mr. Zellner's report, page 104,
  If all Rhinos were subject only to 15 to 20 mile an hour, flat turn, quarter roll over turns with helmeted and belted dummies, the sculpted door would tend to decrease leg and head injuries as well as total body injuries

- Having considered doors as early as 2004, but concern about disadvantages, why did you wait 3 years before you ordered tests to prove one way or another?

- I have already explained advantages and disadvantages
  But in the concept stage we wanted to come up with a vehicle that would enable the operator to enjoy open riding like an ATV and we did not want the occupant to be tripping
  If users were intentionally sticking out their legs, we should caution them
  With regard to the DRI tests, it was possible for the leg to come out if the customer was not conscious about it


Holt v. Yamaha  vol. II  (February 20, 2009)

- Mr. Watson and I first began meeting and discussing injuries and complaints and claims at the end of 2004

- Mr. Watson did not give me details
  Asked him to tell me the situation in the field
  I recall there were several cases related to Rhino rolling over and injuring people's legs by the end of 2004, but he did not say a number

- Meetings of Mr. Watson increased in 2005

- At the end of 2005, reported to Mr. Shiraishi the situation and wanted to try DRI simulations

- The door is a safety device in part

- It is my testimony that we knew about 50 cases in June of 2007 so when we hired Mr. Zellner in 2005, it would be even less, maybe 20 or 30 cases

Roger Feldman
Advertising

Holt v. Yamaha  (Oct. 3, 2008)

- "As hard-working and tough as the Rhino is, the amazing part is how smooth the ride is over the kind of terrain that would trip up a mountain goat"

- Conjunction of toughness and smooth comfortable ride

- I knew the vehicle had the capability to traverse difficult terrain in a relatively smooth manner, going over rugged terrain and soaking up the bumps

- Was explained to me that doors were for protection from the elements such as weather, mud, dirt and rocks
  Nobody said it was protection in the event of a rollover

Yamaha managers clearly knew that the Rhino would rollover under foreseeable conditions of use.  When considered in light of the promotion of extreme off road use, they created an unreasonably dangerous condition that had the clear potential to cause catastrophic injuries.

In addition to the rollovers documented by Yamaha riders, Yamaha submitted a list of 414 lawsuits and complaints of rollovers to the Consumer Product Safety Commission as of September of 2008.  According to CPSC, there have been at least 60 deaths.  Many of the injuries are catastrophic and severe.

With knowledge of confirmed Yamaha Call Management System rollover complaints and lawsuits, the data generated by the development documents, the knowledge of the hazards presented in the depositions and Yamaha's promotion of

extreme off road riding, Yamaha failed to address the unreasonable risk of injury associated with the foreseeable use of the Rhino.


        <u>Hierarchy of Safety Management</u>

        Well, I mean, you're talking about primary warning theories
        that you would design out the hazard.  Your second choice is
        to guard it.  Your third choice is to warn against it.

                Emroy Watson in <u>Wells v. Yamaha</u>


        As noted above, the National Safety Council has developed a hierarchy of safety management codifying what had been discussed previously for many years indicating that the highest and best corrective action is to eliminate the hazard to substantially reduce the risk of injury.  If it is not possible to eliminate, the next step in order is to guard against the hazard and place a barrier between the operator and the potential for harm.  Finally in the last instance, if there is still residual risk associated with the use of the product, warnings are appropriate to inform users of the danger and motivate them to avoid injury.

        In the case of the Rhino, Yamaha proceeded precisely backwards in the application of safety measures.  First, in 2006, they tried a warning to tell people to keep their arms and legs inside the vehicle when it rolls over.  When injuries persisted, they offered a guard in the form of a half door between the user and the ground in 2007.  And finally, in 2009 in conjunction with the Consumer Product Safety Commission, they took steps to widen the track width by approximately 4 inches to reduce the potential for rollover.  Yamaha's process was warn, guard and eliminate as opposed to the reverse as described in most safety management texts.

## Disclosure of Hazards and Failure to Warn

In his recent deposition In Re:  Yamaha Rhino Litigation, in the State Court of Gwinnett County, State of Georgia, on November 17, 2009, Emroy Watson, former product liability counsel for Yamaha, states:

- As a general proposition, a manufacturer should disclose all known dangers associated with a product and the dangers should be shared with the users.

- People looking at a Rhino would understand that it is reasonably safe and that a reasonably safe vehicle should not have any latent or hidden danger.

- It doesn't make sense to tell people what to do in a rollover because their actions are involuntary.

- On the September 2006 sticker, people were told what to do in a rollover.

- Some people might try to prevent tipover by sticking their legs out intentionally.

- In August of 2007, doors were offered to prevent legs from exiting the vehicle, to reduce the likelihood of legs being stuck out.

Yet Yamaha failed to fully disclose the hazards and risks of injury to Rhino operators.  They deprived riders of the opportunity to use that information to decide whether or how to ride the Rhino, especially in light of Mr. Watson's knowledge that the Rhino would appear reasonably safe.  They failed to disclose, as Mr. Suzuki testified, that the Rhino can rollover at less than 20 miles per hour depending on surface, acceleration and steering.  They failed to disclose what Pat Williams told them about lower leg injuries and how John Zellner told them they could substantially reduce the risk of injury.

Yamaha failed to adequately apply the requirements of the ANSI Z535.4 - 2002 industry voluntary standard, <u>Product Safety Signs and Labels</u>, to address expected use patterns and to explicitly warn owners and operators of hazards and probable consequences created by "reasonably anticipated product use or misuse." The standard states, in part:

> 4.11.2   **product safety sign or label**: Sign, label, cord tag, or decal affixed to a product that provides safety information about that product. The product safety sign should identify the hazard, the degree or level of hazard seriousness, the probable consequence of involvement with the hazard, and how the hazard can be avoided.

> 4.11.2.1   **permanent safety sign or label**: Information affixed to a product to warn against potential exposure to hazards inherent in the normal use associated with the product, or which might be created during other reasonably anticipated product use or misuse. The sign or label is to be permanently affixed to the product so that it cannot be easily removed.

Warning consumers about hazards inherent in normal use as well as reasonably anticipated product use or misuse is critical to an adequate warning. Specific description of hazards and potential consequences can inform users of dangers they might otherwise fail to appreciate.

Another critical issue to consider in developing warnings is explicitness. The more explicit the message, the greater the perception of severity, which creates a greater intent to act cautiously according to research done by Kenneth Laughery at Rice University in 1973. This study found that "When the severity of the potential hazard is great, only explicit information conveys severity information adequately." Further, the study states:

Without exception, explicit warnings were associated with perceptions of greater injury severity and perceived dangerousness, greater manufacturers concern for safety, and better understanding of the hazard.

In his deposition in <u>Wells v. Yamaha</u>, Emroy Watson states:

But from a general concept, warnings are intended to inform people of a risk and a hazard.  And then you identify the consequence and then how to avoid it.

Mr. Watson further states his belief that the new wording and pictorials would benefit operators.

Yet, the Yamaha labels failed to warn operators of the dangers of rollover during normal and "reasonably anticipated product use or misuse" as required by the ANSI standard.  While Mr. Suzuki agrees that the Rhino could rollover on flat ground under 20 mph, there is no warning that catastrophic injury can result under such conditions.  Only unexplained "Improper use" or "sharp, high speed turns" are cited in a difficult to follow format.  Rollbar labels cite only slopes, uneven terrain and turning too fast as increased risk factors.  Considering the promotion of the Rhino on extreme terrain including slopes, uneven terrain, it appears Yamaha encourages such risk factors and rather than offer a barrier to protect users when it does rollover, they rely on the operator and passenger to compensate for the unreasonably dangerous condition Yamaha creates.

Section 15 of the CPSA

Section 15(b) of the Consumer Product Safety Act requires manufacturers to report to the Consumer Product Safety Commission when they obtain information that reasonably supports the conclusion that their product either:

- contains a defect which could create a substantial product hazard or
- creates an unreasonable risk of injury or death.

The CPSC regulations at 16 CFR 1115 further define these responsibilities.

Section 1115.4 defines defect, at a minimum, as flaw, fault, weakness or failure in a product. It can be a defect in manufacture or design. At a minimum, defect includes the dictionary or commonly accepted meaning of the word. Thus, a defect is a fault, flaw, or irregularity that causes weakness, failure, or inadequacy in form or function. In addition, the design of and the materials used in a consumer product may also result in a defect. Thus, a product may contain a defect even if the product is manufactured exactly in accordance with its design and specifications, if the design presents a risk of injury to the public. A design defect may also be present if the risk of injury occurs as a result of the operation or use of the product or the failure of the product to operate as intended. A defect can also occur in a product's contents, construction, finish, packaging, warnings, and/or instructions. In addition, this section states that "subject firms are urged to report if in doubt as to whether a defect could present a substantial product hazard." The rule requires reporting within 24 hours of reasonably obtaining the necessary information.

Section 1115.12(a) reiterates the Commission's view, and states that companies should not delay reporting to determine to a certainty the existence of a defect. The firm is not required to admit the existence of a defect, but is required to report information about the potential danger to the CPSC so that an evaluation of the hazard and the need for corrective action such as a recall can be reviewed.

Under Section 1115.12(f), the Commission lists examples of information that a company should study and evaluate to determine whether to report to the Commission. These include:

- Engineering, quality control or production data
- Product liability suits and claims for injury or property damage
- Information from independent test labs
- Safety-related production or design change(s)
- Product liability suits and/or claims for personal injury or damage

Section 1115.12(d) states:

> *Death or grievous bodily injury.* Information indicating that a noncompliance or a defect in a consumer product has caused, may have caused, or contributed to the causing, or could cause or contribute to the causing of a death or grievous bodily injury (e.g., mutilation, amputation/ dismemberment, disfigurement, loss of important bodily functions, debilitating internal disorders, severe burns, severe electrical shocks, and injuries likely to require extended hospitalization) must be reported, unless the subject firm has investigated and determined that the information is not reportable.

Certainly no later than, and by many measures well before the end of 2005, when Mr. Suzuki admitted to knowledge of 20-30 rollovers and recommended contacting John Zellner to analyze Rhino injuries, Yamaha had adequate information to report. Mr. Zellner's results in March of 2006 provide further evidence of the need to notify the Commission.

By the time David Murray and Emroy Watson met face to face with the CPSC staff at Yamaha's request on August 3, 2006, they had obtained more than enough information that reasonably led to the conclusion that the Rhino contained a defect (as defined in 16 CFR 1115.4) which "could create" a substantial product hazard. They had documentation of at least 15 rollover lawsuits filed (about half of which were provided to the CPSC on August 8) and 20 rollover complaints received through the Yamaha Call Management System, none of which appear in the CPSC record. By that time, Yamaha already had substantial data to prompt a report. Yet right up until the "recall" and repair program was announced, Yamaha continued to deny their responsibility to report.


CPSC File August 2, 2006 to April 16, 2009

After meeting with the Consumer Product Safety Commission in August of 2006 for the first time regarding safety issues with the Yamaha Rhino on August 3, 2006, David Murray, Yamaha's Corporate Washington Counsel, sent the CPSC copies of certain complaints and claims describing leg and foot injuries in Rhino rollover events. The letter states specifically that the information is being provided in response to CPSC staff requests and not pursuant to Section 15 of the Consumer Product Safety Act which covers recalls and corrective action.

Yet the materials only cover a portion of that data available to Yamaha. Only 9 complaints from lawsuits filed and received by Yamaha by the date of the letter were actually included. Eight filed and received lawsuits were apparently not provided. In addition, based on the information in Yamaha's possession, 15 complaints made directly to Yamaha concerning Rhino rollovers cataloged in their Call Management System were not provided. It appears that from the first instance, Yamaha failed to provide full disclosure to the Commission of their knowledge of the unreasonably dangerous condition created by the foreseeable use of the Rhino. This safety critical information should have been the basis for Yamaha to initiate the Section 15 reporting process so that the Commission and Yamaha could move forward and fully evaluate the

potential danger and develop adequate safety measures to protect Rhino operators. Instead, Yamaha refused to report for nearly 2 years as the number of injuries substantially increased. None of the development documents were apparently provided, and none of the reports and depositions generated in the lawsuits were included in the file.

Over the course of the next 18 months, additional meetings were held but none were considered compliance meetings by Yamaha that would have initiated the reporting requirement. On August 24, 2007, David Murray submitted to the Commission a number of documents concerning the program to introduce new side door panels and passenger handholds. Three days later on August 27, 2007, the Commission staff asked Ann Staron, Assistant to David Murray, whether the submission of that material is intended to be a Section 15 report or just a supplement to the meeting with Mr. Murray. The response from Yamaha was that this was only a supplement to their past meetings with CPSC staff. As rollovers and injuries continued to rise, Yamaha refused to provide a report to the Commission under Section 15 of the Consumer Product Safety Act.

Nearly another year went by with no further communication from Yamaha evident in the file. Then, on July 28, 2008, Yamaha and the CPSC staff set up a product demonstration in Hagerstown, Maryland, about 60 miles from the CPSC headquarters in Bethesda, Maryland.

On September 10, 2008, less than 6 weeks after the product demonstration, and without a voluntary Section 15 report by Yamaha, the Commission staff opened a Section 15 file (CA080092) for Yamaha and the Rhino utility vehicle. The letter states in part that the Commission has received information which indicates the product can rollover at low speed on even terrain, that the product static stability is low and has a narrow track width. Further, the letter states that the open cabin can allow a rider's arms and legs to protrude from the vehicle. These factors indicated to the staff that the product may pose an unreasonable risk of injury or death to riders. The letter further states it is now the responsibility of the staff to make a preliminary determination under Section 15

as to whether the Rhino presents a substantial product hazard. The failure of Yamaha to report and provide the information required under Section 15 caused the Commission to specifically request the additional documents. Rather than voluntarily reporting to the Commission under the Consumer Product Safety Act and the regulations that the product either could create a substantial product hazard or may present an unreasonable risk of injury, the Commission had to open the case on their own to further investigate those dangers.

After additional correspondence, Yamaha told the Commission again on October 15, 2008 that they did not believe that the reported 414 rollover incidents resulted from any design or manufacturing defect, nor did those incidents provide any basis to conclude that a substantial product hazard exists. Even after the Commission had opened a file under Section 15, Yamaha continued their refusal to admit that the product contained a defect that "could create" a substantial product hazard or may pose an unreasonable risk of injury or death under the regulations.

On January 6, 2009, the Commission issued a Special Order and Subpoena to Yamaha to obtain the information Yamaha had not provided to the Commission. On January 28, 2009, they responded continuing to claim

- Yamaha's design theme was "go anywhere with safety"

- The Yamaha Rhino has appropriate wheel base and tread width

- The best way to reduce Rhino associated arm and leg injuries is to rely on the operator's safety awareness, rather than the doors they already provide

- Rhino has excellent stability, despite identifying 414 rollover claims and lawsuits

A series of emails dated March 28, 2009 highlight the contentious dialogue between Yamaha and the CPSC over the use of the word recall in the press release. CPSC Deputy Director of Compliance, Marc Schoem, wrote David Murray that the Commissioners were concerned about the word "recall" not being used in the press release, noting that prior Yamaha "repair" programs were called recalls without protest. Mr. Murray wrote back and stated that the press release without using the word recall is "critically important to Yamaha, and factored heavily in its decision to accommodate the Commission's other requests." Finally, he asked Mr. Schoem to "Please hold the line on its use of this term under all the circumstances and concessions that Yamaha has made to cooperate." Later that same day, Mr. Schoem makes clear that without an agreement, "If we were to make a PD [preliminary determination] it would be a Class A hazard."

The CPSC <u>Recall Handbook</u> states:

**Class A Hazard**

Exists when a risk of death or grievous injury or illness is likely or very likely, or serious injury or illness is very likely.

Class A hazards warrant the highest level of attention. They call for a company to take immediate, comprehensive, and imaginative corrective action measures to identify and notify consumers, retailers and distributors having the defective product and to remedy the defect through repair or replacement of the product, refunds, or other measures.

On April 16, 2009, a few days after reaching agreement with Yamaha, the CPSC staff accepted the corrective action plan that included notice to consumers of the risks, stop manufacture, repair the Rhino with a 500 mm spacer on each rear hub to increase the track width, the removal of the rear anti-sway bar, a free helmet offer, instructional videos and the continuing provision of the half doors. Attached to the letter was the following listing:

**Voluntary Corrective Action Plans Under**

**Section 15 of the Consumer Product Safety Act and**

**Section 15 of the Federal Hazardous Substances Act**

| DATE | FIRM AND PRODUCT | ALLEGED HAZARD | REMEDY |
|------|------------------|----------------|--------|
| 03/09 | Yamaha Motor Corporation USA<br><br>Cypress, CA  90630-5101<br><br>Rhino Utility Vehicles<br>(450, 660, and 700 Models) | Potential for rollovers due to vehicle's stability and undesirable handling characteristics | Door offer, Spacer/ Sway Bar Offer, Helmet/DVD offer free of charge to consumers |

Yamaha's claim that their "free repair" as described in the March 31, 2009 CPSC press release is not a traditional recall strains the bounds of credibility. The program requires Yamaha to suspend sales and for consumer to "immediately" stop using the vehicle. The purchaser must return the Rhino to Yamaha for the installation of spacers to increase track width and to remove the rear anti-sway bar "to reduce the chance of a rollover."

On Yamaha's "Truth About Rhino" website, Yamaha describes the CPSC-Yamaha repair program. They state in part

**Information on the CPSC-Yamaha Repair Program**

**Announcement (NOT A RECALL)**

**This is not a recall.  This is a voluntary repair program.**

This statement regarding the announcement can be attributed to Yamaha:

"It is important to note that the U.S. Consumer Product Safety Commission (CPSC) announcement on March 31, 2009, regarding the Rhino Side-by-Side vehicle was not a recall. This is a voluntary repair program. *The difference is that this was the result of technical discussions between Yamaha and the CPSC, and Yamaha agreed to address concerns raised by CPSC.* [emphasis added]

The safety of our customers drives everything we do at Yamaha Motor Corporation, U.S.A.

According to the CPSC, there have been over 4500 recalls since the recall of a Tappan built in oven in June of 1973. Nearly all of the recalls have been voluntary. Well less than one tenth of 1 percent were ordered by the Commission or a Court after an adjudicative process. Virtually all 4500 recalls resulted from "technical discussions" between the company and the CPSC, and the company agreed to address concerns raised by the company and CPSC.

The general CPSC website includes a listing of product recalls sorted by company. Selecting Yamaha identifies 12 results, the most recent press release under "Find Recalled Product by Company" is the March 31, 2009 Yamaha Rhino "Free Repair." The next recall is the Yamaha Rhino brake failure of March 25, 2008, where consumers are instructed to stop using the product immediately. The hazard is described as an incorrectly made brake caliper that can result in loss of control posing a serious risk. There were no reported injuries. Consumers are then instructed to contact Yamaha and to "schedule a free repair." There appears to be virtually no difference between the two programs. Yamaha's insistence that the current "Repair program" is not a recall appears to be meaningful only to Yamaha. There are 10 additional Yamaha recalls listed, 6 for motorized vehicles.

Yamaha was well aware of the potential for catastrophic injury during reasonably anticipated use or misuse of the Rhino as described by various standards. Their promotion of "terrainability" can inject additional hazards into foreseeable riding.

It is my opinion, based on their extensive experience in developing, manufacturing and marketing off-road vehicles, that Yamaha failed to adequately address the known risks of catastrophic and substantial injury and death associated with the foreseeable use of the Yamaha Rhino. Yamaha failed to take steps to address the unreasonably dangerous condition created by such foreseeable use and failed to provide owners and operators with adequate safety measures, warnings and instructions to substantially reduce or eliminate those injuries and deaths.

*Wm F Kitzes*

*January 6, 2010*

**Ten Principles of Safety Management:**

1.  Establish and Observe a Written Corporate Safety Policy.

2.  Create an Independent Safety Review Process.

3.  Identify and Evaluate the Severity and Foreseeability
    of Product Hazards.

4.  Assess the Risk of Injury by Evaluating
    Product Hazards, the Environment and Foreseeable Use.

5.  First Attempt to Eliminate Hazards. If not Possible, then Reduce
    the Opportunity for Injury by Guarding Against the Hazards.

6.  Warn Users of Product Dangers and Motivate them
    to Avoid Injury.

7.  Promote Only the Safe Use of a Product.

8.  Maintain Safety Related Records During the Useful Life
    of the Product.

9.  Continuously Monitor the Safety Performance of the Product
    in the Hands of Users.

10. Promptly Notify Product Users and Institute Recall Procedures
    Where Necessary to Substantially Reduce or Eliminate Injury.

*Safety Management and the Consumer Product Safety Commission,*
*Professional Safety, Journal of the American Society of Safety Engineers*
--- ***Wm. F. Kitzes,*** *1991 (2008)*



## A Systems Approach to Developing Safer Consumer Products

**Written Corporate Safety Policy**
Independent Review • Worldwide Standards • Document Retention

Product Concept  ←→  Hazard Identification

**Risk Assessment**
Target Populations
Hazards • Environment • Foreseeable Use
Technical Standards • Research
Injury Data • Severity

Design Review Testing and Approval     Eliminate Hazards Guard • Warn

Manufacture     Quality Control

Sale to Consumers     Promote Safe Use

Monitor Safety Performance

Reasonably Safe
Satisfied Customer
Profit Potential

Unreasonably Dangerous
Recall / Warning
Corrective Action

www.productsafety.com
Bill Kitzes © 2008

See attached Curriculum Vitae for additional information.  Compensation for research and analysis is $1950 per 8 hour day.  Fees for deposition and trial are $2950 per day.

Documents Reviewed:

www.yamaha-motor.co.jp/global/about/philosophy/index.html

ANSI Z535.4 - 2002 Standard for Product Safety Signs and Labels

Product Safety Management Guidelines, National Safety Council, 1989

ISO / IEC Guide 51--Safety aspects--Guidelines for their inclusion in standards, 1999

ISO 9001, 9004  Quality Management Systems, 2000

"ISO International Safety Standards:  Contents and Trends," Technology Report 15, Espec Corporation of Japan, 2003

ANSI Technical Report (B11.TR3-2000) Risk Assessment and Risk Reduction--A Guide to Estimate, Evaluate and Reduce Risks Associated with Machine Tools, 2000

"Explicitness of consequence information in warnings," Kenneth R. Laughery, et al. Rice University, Safety Science, 1993

"Product warning labels:  how best to get the message across," Paul Frantz Sally Pobojewski, The University Record, University of Michigan, November 16, 1992

Yamaha Promotions and Advertising

Rhino on-product labels and owner's manual

Video entitled "Mike Martinez Day Off"

Video Yamaha "Outdoors"

"YCMS" Yamaha Call Management System

<u>Yamaha Development Documents</u>

June 3, 1999       <u>Memo to Ike Miyachi</u>
RHINOYMMC-00002137

Dec. 9, 1999       <u>NGV Wrap-up Meeting Minutes</u>
RHINOYMMC-00010537

Aug. 22, 2001       <u>Email from Pat Williams to Joel Cheek</u>
<u>NGV Comments and Observations</u>
RHINOYMMC-00010052

Aug. 31, 2001       <u>Engineering Meeting Minutes Project 01J (NGV)</u>
RHINOYMMC-00002248

July 16, 2002       <u>01J Meeting Minutes</u>
RHINOYMMC-00000983

Aug. 1, 2002       <u>Model Review Meeting 01J (5UG1)</u>
RHINOYMMC-00011622

Sept. 12, 2002       <u>Model Review--Meeting Minutes  09/12/02</u>
RHINOYMMC-00000982

Mar. 10, 2003       <u>01J Meeting Minutes 3/10/03</u>
RHINOYMMC-00007926

Mar. 29, 2004       <u>Yamaha 2004 Rhino 660 Turkey Hunt, Concan , TX  PowerPoint</u>
RHINO 30678

Mar. 3, 2006       <u>Analysis of Potential Leg Restraint Devices for a Side-by Side Vehicle</u>
John Zellner Powerpoint Presentation

June 22, 2006       <u>Yamaha Employee Incident Form</u>
RHINOYMMC-00002286

June 22, 2006       <u>Yamaha Warning Label Option</u>
RHINOYMUS-00000423

Sept 11, 2006       Yamaha Letter to Owners enclosing warning label
RHINO  05147

June 4, 2007      David Murray to Mark Kumagai (CPSC)
                  RHINO-CPSC-00000005

Aug. 24, 2007     David Murray to Mark Kumagai (CPSC)
                  RHINO-CPSC-00000008

Aug. 27, 2007     Yamaha Letter to Rhino Owners
                  RHINO 05208

Nov. 30, 2007     Development of Yamaha Rhino Owner's Manual & Labeling
                  RHINO 20308

Mar. 15, 2008     Analysis of Foot Restraint Devices for a Side by Side Vehicle,
                  J. W. Zellner

April 2008        Demonstration and Description of Yamaha Rhino Novice Operation
                  RHINO 21187

Mar. 23, 2009     David Murray to Marc Schoem (CPSC)
                  RHINO-CPSC-00000098

See Attached Bates Numbers for Additional Yamaha Documents


Depositions

        Eiji Kato in Grimes v. Yamaha (Nov. 17, 2005)

        Eiji Kato in Wells v. Yamaha (Oct. 19, 2006)

        Eiji Kato in Holt v. Yamaha vol. I (Feb. 25, 2009)

        Michael Martinez in Grimes v. Yamaha (Dec. 15, 2005)

        Phillip McRae in Grimes v. Yamaha (June 8, 2006)

        Caleb Chesser in Grimes v. Yamaha (June 8, 2006)

        Randy Langley in Grimes v. Yamaha (June 9, 2006)

Chad Buckhalt <u>In Re:  Yamaha Rhino Litigation</u> (June 22, 2009)

Gil Edwards <u>In Re:  Yamaha Rhino Litigation</u> (June 30, 2009)

Paul Edward Hayes <u>In Re:  Yamaha Rhino Litigation</u> (Dec. 5, 2009)

Ike Miyachi in <u>Grimes v. Yamaha</u> (Sept. 8, 2006)

Emroy Watson in <u>Grimes v. Yamaha</u> (Oct. 25, 2005)

Emroy Watson in <u>Wells v. Yamaha</u> (Dec. 15, 2006)

Emroy Watson in <u>Gay v. Yamaha</u> (Aug. 6, 2007)

Emroy Watson in <u>Swainston v. Yamaha vol. 1</u> (Feb. 25, 2009)

Emroy Watson in <u>Holt v. Yamaha vol. I & II</u> (Feb. 12, 13, 2009)

Emroy Watson <u>In Re:  Yamaha Rhino Litigation</u> (Nov. 17, 2009)

Takanori Suzuki in <u>Gay v. Yamaha (2 vols)</u> (June 28, 29, 2007)

Takanori Suzuki in <u>Sturgeon v. Yamaha</u> (May 23, 2008)

Takanori Suzuki in <u>Holt v. Yamaha vol. II</u> (February 20, 2009)

Roger Feldman in <u>Holt v. Yamaha</u> (Oct. 3, 2008)

John Zellner in <u>Sturgeon v. Yamaha vol. II</u> (November 6, 2008)


<u>CPSC - Yamaha Documents</u>

Aug. 2, 2006     Email Murray to Topka
                 RHINO-CPSC-00000001

Sept. 8, 2006    Letter from Murray to Topka
                 RHINO-CPSC-00000002

June 4, 2007      Letter from Murray to Kumagai
                  RHINO-CPSC-00000005

July 18, 2007     CPSC Public Calendar
                  RHINO-CPSC-00000007

Aug. 24, 2007     Letter from Murray to Kumagai
                  RHINO-CPSC-00000008

Aug. 27, 2007     Email from Staron to Topka
                  RHINO-CPSC-00000009

April 9, 2008     CPSC Public Calendar
                  RHINO-CPSC-00000012

April 16, 2008    Demonstration and Description of Yamaha Rhino Novice Operation
                  RHINO-CPSC-00000013

June 30, 2008     Email from Murray to Leland
                  RHINO-CPSC-00000017

July 28, 2008     Fax from Leland to Murray
                  RHINO-CPSC-00000026

Sept. 10, 2008    Letter from Topka to Murray
                  RHINO-CPSC-00000029

Sept. 24, 2008    Letter from Murray to Topka
                  RHINO-CPSC-00000030

Oct. 2, 2008      Email from Staron to Topka
                  RHINO-CPSC-00000034

Oct. 15, 2008     Letter from Murray to Topka
                  RHINO-CPSC-00000036

Oct. 31, 2008     Email from Staron to Topka
                  RHINO-CPSC-00000042

Dec. 5, 2008      Email from Murray to Malihi
                  RHINO-CPSC-00000051

Jan. 28, 2009        Yamaha Response to Special Order and Subpoena
                     RHINO-CPSC-00000060

Feb. 13, 2009        Letter from Murray to Schoem
                     RHINO-CPSC-00000070

Feb. 26, 2009        Letter from Murray to Schoem
                     RHINO-CPSC-00000082

Mar. 23, 2009        Letter from Murray to Schoem
                     RHINO-CPSC-00000098

Mar. 28, 2009        Emails between Murray and Schoem
                     RHINO-CPSC-00000116

Mar. 29, 2009        Email and Letter from Murray to Schoem
                     RHINO-CPSC-00000117

April 16, 2009       Letter from Topka to Murray
                     RHINO-CPSC-00000134


CPSA and Regulations at 16 CFR 1115

Yamaha "Truth about Rhino" Website

CPSC News Release "Yamaha Motor Corp. Offers Free Repair for 450, 660, and 700 Model Rhino Vehicles," March 31, 2009

CPSC Website -- Find Recalled Products by Company

CPSC Recall Alert "Yamaha Motor Corporation U.S.A. Recalls Rhino Side-by Side Vehicles Due to Risk of Brake Failure," March 25, 2008

CPSC Recall Handbook

CPSC File [RHINO-CPSC 1-134]

CPSC Handbook and Standard for Manufacturing Safer Consumer Products 1975, 2006

| | | |
|---|---|---|
| RHINOYMC-00000345 | RHINOYMMC-00002146 | RHINOYMMC-00011701 |
| RHINOYMMC-00000038 | RHINOYMMC-00002147 | RHINOYMMC-00012263 |
| RHINOYMMC-00000039 | RHINOYMMC-00002151 | RHINOYMMC-00013601 |
| RHINOYMMC-00000040 | RHINOYMMC-00002152 | RHINOYMMC-00013688 |
| RHINOYMMC-00000171 | RHINOYMMC-00002153 | RHINOYMMC-00016077 |
| RHINOYMMC-00000172 | RHINOYMMC-00002166 | RHINOYMUS-00000330 |
| RHINOYMMC-00000175 | RHINOYMMC-00002183 | RHINOYMUS-00000331 |
| RHINOYMMC-00000179 | RHINOYMMC-00002241 | RHINOYMUS-00000332 |
| RHINOYMMC-00000182 | RHINOYMMC-00002248 | RHINOYMUS-00000335 |
| RHINOYMMC-00000196 | RHINOYMMC-00002250 | RHINOYMUS-00000393 |
| RHINOYMMC-00000198 | RHINOYMMC-00002279 | RHINOYMUS-00000399 |
| RHINOYMMC-00000199 | RHINOYMMC-00002281 | RHINOYMUS-00000401 |
| RHINOYMMC-00000201 | RHINOYMMC-00002527 | RHINOYMUS-00000661 |
| RHINOYMMC-00000204 | RHINOYMMC-00002532 | RHINOYMUS-00000787 |
| RHINOYMMC-00000207 | RHINOYMMC-00002543 | RHINOYMUS-00001102 |
| RHINOYMMC-00000209 | RHINOYMMC-00002552 | RHINOYMUS-00001147 |
| RHINOYMMC-00000212 | RHINOYMMC-00006939 | RHINOYMUS-00001149 |
| RHINOYMMC-00000218 | RHINOYMMC-00007777 | RHINOYMUS-00033669 |
| RHINOYMMC-00000220 | RHINOYMMC-00007925 | RHINOYMUS-00033817 |
| RHINOYMMC-00000222 | RHINOYMMC-00007926 | RHINOYMUS-00036290 |
| RHINOYMMC-00000223 | RHINOYMMC-00007941 | RHINOYMUS-00036645 |
| RHINOYMMC-00000232 | RHINOYMMC-00007952 | RHINOYMUS-00036687 |
| RHINOYMMC-00000247 | RHINOYMMC-00007953 | RHINOYMUS-00036863 |
| RHINOYMMC-00000249 | RHINOYMMC-00007954 | RHINOYMUS-00036874 |
| RHINOYMMC-00000253 | RHINOYMMC-00008541 | RHINOYMUS-00037007 |
| RHINOYMMC-00000258 | RHINOYMMC-00008563 | RHINOYMUS-00037691 |
| RHINOYMMC-00000306 | RHINOYMMC-00009788 | RHINOYMUS-00038402 |
| RHINOYMMC-00000430 | RHINOYMMC-00010052 | RHINOYMUS-00038426 |
| RHINOYMMC-00000476 | RHINOYMMC-00010060 | RHINOYMUS-00038427 |
| RHINOYMMC-00000883 | RHINOYMMC-00010072 | RHINOYMUS-00038476 |
| RHINOYMMC-00000979 | RHINOYMMC-00010079 | |
| RHINOYMMC-00000981 | RHINOYMMC-00010088 | |
| RHINOYMMC-00000982 | RHINOYMMC-00010330 | |
| RHINOYMMC-00000983 | RHINOYMMC-00010332 | |
| RHINOYMMC-00000984 | RHINOYMMC-00010333 | |
| RHINOYMMC-00000986 | RHINOYMMC-00010448 | |
| RHINOYMMC-00001002 | RHINOYMMC-00010456 | |
| RHINOYMMC-00001130 | RHINOYMMC-00010469 | |
| RHINOYMMC-00001727 | RHINOYMMC-00010500 | |
| RHINOYMMC-00001728 | RHINOYMMC-00010502 | |
| RHINOYMMC-00001730 | RHINOYMMC-00010505 | |
| RHINOYMMC-00001939 | RHINOYMMC-00010536 | |
| RHINOYMMC-00001985 | RHINOYMMC-00010537 | |
| RHINOYMMC-00002010 | RHINOYMMC-00010672 | |
| RHINOYMMC-00002137 | RHINOYMMC-00011622 | |
| RHINOYMMC-00002143 | RHINOYMMC-00011631 | |

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561)  241-1900

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager
———————

Safety Analysis
Warnings
Expert Testimony

**CURRICULUM VITAE**

**William F. Kitzes**

Safety Management
www.productsafety .com
kitzes@productsafety.com
———————

FAX:
(561) 241-1903

## Education

University of Wisconsin, B.A.; 1972
Washington College of Law, American University, J.D.; 1975
Certificate in Safety Management (1989)
    American Society of Safety Engineers
University of Michigan, College of Engineering,
    Human Factors Engineering, Summer 1990
Executive Program in Safety Management (2007)
    American Society of Safety Engineers

## Professional Safety Associations

National Safety Council • American Society of Safety Engineers
Board of Certified Product Safety Management, Executive Level
Board of Certified Hazard Control Management, Master Level
Human Factors Society • System Safety Society
International Consumer Product Health and Safety Organization
Florida Propane Gas Safety, Education and Research Council
Chairman, Florida Consumers' Council  (1993-2007)

## Work Experience

### U.S. Consumer Product Safety Commission
### Washington, D.C.  20207

#### 1975-1981

| | |
|---|---|
| 1975 - 1977 | Legal Advisor to the Director, Section 15<br>Office of Product Defect Identification |
| 1977 - 1980 | Program Manager<br>Sports, Recreation & Power Equipment<br>Office of the Executive Director |

1980 - 1981          Regulatory Counsel
                     Office of the General Counsel

The Institute for Safety Analysis, Inc.
Rockville, Maryland 20850

1981 - 1983
Vice President and General Manager

Consumer Safety Associates

1983 - Present
Safety Analyst, Product Safety Manager

Professional Experience

Mr. Kitzes has extensive experience in safety analysis, regulatory development,
and management systems.  His background includes the following activities:

    o    Managed and supervised professional staff of 18
in preparing safety engineering analysis for
nationally-known technical consulting firm which
specialized in evaluating the safety performance
of automotive and consumer products

    o    Developed the Federal Safety Standard for Power
Lawn Mowers, 16 CFR 1205; February 1979

    o    Developed programs to identify and analyze safety
performance data to evaluate compliance with the
reporting requirements of Section 15 of the
Consumer Product Safety Act

    o    Negotiated voluntary corrective action programs
and consent agreements with major manufacturers
to recall defective products

    o    Managed interdisciplinary task force of engineers,
epidemiologists, attorneys, and investigators in
developing standards and communications programs
for sports, recreation, and power equipment

o   Conducted special studies of nationwide injury
patterns using the National Electronic Injury
Surveillance System (NEISS)

o   CPSC Awards include the
Silver Medal for Meritorious Service, 1977 and the
Superior Achievement Award, 1979

Seminars and Workshops

Mr. Kitzes is an active speaker, author, and educator on safety-related issues.  The
following is a partial list of seminars, workshops, and lectures given by Mr. Kitzes
since 1975:

Compliance Issues and The Consumer Product Safety Act, Diebold Research
Group, 245 Park Avenue, New York, 1975

Government Action Under the Consumer Product Safety Act with Professor
Robert Vaughn, Washington college of Law, American Bar Association,
Washington, D.C., 1975

Consumer Safety Officer Training in accident analysis and implementing the
provisions of Section 15 of the Consumer Product Safety Act (CPSA), U.S.
Consumer Product Safety Commission, New York, Chicago, Minneapolis, and San
Francisco, 1975 and 1976

Manufacturers Compliance Seminar on safety analysis and accident investigation
for Sections 15 and 19 of the Consumer Product Safety Act (CPSA), U.S.
Consumer Product Safety Commission, Kansas City, Missouri

Marketing Analysis and Government Action, panel with Dr. Salvatore Davita,
George Washington University, Washington, D.C.  1976

Reporting Requirements and Corrective Action Plans Under Section 15 of the
CPSA, Product Safety Conference, Washington, D.C., 1976

Implementing the New Requirements for Notification and Reporting:
16 CFR 1115, Product Safety Conference, Washington, D.C.  1977

Changes in the Proposed Standard for Power Lawn Mowers, Outdoor Power
Equipment Institute, Washington, D.C.  1978

The Federal Regulatory Process, National Institute for Paralegal Training,
Philadelphia, Pennsylvania, 1978 & 1979

<u>The Art of Applying Technology in Personal Injury Lawsuits</u>,
Regulatory Data -- A Buried Treasure, National Center for Technology
in Law, Hunt Valley, Maryland, 1981

<u>The Human Factor</u>:  a safety/needs analysis of the modern fire fighting
environment, with Richard L.P. Custer, Foundation for Fire Safety, Cliffside
Manor, Harpers Ferry, West Virginia, 1981

<u>CPSC and ATVs</u>, AIEG, October 1986, and May 1987

<u>ATV Safety</u>, National Association of Attorneys General, October, 1987

<u>Safety Analysis and the CPSA</u>, American Pleasure Boat Safety Association,
January, 1988 and 1989

<u>Safety Management and the CPSC</u>, James Tuck Memorial Lecture, Keynote
Address, Detroit, Michigan, June 1990

<u>Safety Analysis and Product Safety Management</u>, Texas Trial Lawyers Product
Liability Seminar, Houston, Texas, April 1994

<u>Safety Management and the Consumer Product Safety Commission</u>, The
Academy of Florida Trial Lawyers, Orlando, Florida, January 1995

<u>Panel on Child Safety</u>, International Consumer Product Health and Safety
Organization, Orlando, Florida, March 1995

<u>Recalls, Defects and Public Disclosure:  Panel Discussion</u>, International Consumer
Product Health and Safety Organization, Orlando, Florida, March 1996

<u>National Safety Council Congress and Exposition</u>, Session #51
Post Sale Corrective Action Plans - Recalls and Consumer Notice, Educational
Resources Division, Orlando, Florida, October 1996

<u>National Safety Council Congress and Exposition</u>, Session #152
Injury Prevention Analysis:  Guidelines for Product Safety Managers, Educational
Resources Division, Chicago, Illinois, October 1997

<u>Worldwide Juvenile Product Safety Panel</u>, International Consumer Product Health
and Safety Organization, Orlando, Florida, February 1998

<u>The Faces of the Future Seminar</u>, Keenan's Kids Foundation, Atlanta, Georgia,
May 1998

<u>The Role of the Safety Analyst</u>,  Kentucky Academy of Trial Attorneys, Louisville,
Kentucky, May 1998

National Safety Council Congress and Exposition, Session #69
When Risk Can't Be Eliminated:  Building Adequate Warnings, Educational
Resources Division, Los Angeles, California, October 1998

Freedom of Information, CPSC-ABA Forum, International Consumer Product
Health and Safety Organization, Orlando, Florida, February 1999

Protecting Our Kids, Faces of the Future Seminar, Keenan's Kids Foundation,
Atlanta, Georgia, March 1999

CPSC Compliance Workshop, Preparing, Developing and Implementing a
Successful Recall Program, Los Angeles, California, October 1999

CPSC Compliance Workshop, Conducting a Recall - Fast Track vs. Traditional,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2000

CPSC Compliance Workshop, Designing, Producing and Distributing Safer
Consumer Products, International Consumer Product Health and Safety
Organization, Orlando, Florida, February 2001

Ten Principles of Product Safety Management,  Kentucky Academy of Trial
Attorneys, Louisville, Kentucky, May 2001

CPSC Compliance Course, Recall Success Stories, International Consumer
Product Health and Safety Organization, Orlando, Florida, February 2002

Masters in Trial, American Board of Trial Advocates, Chicago, Illinois,
June 2002

CPSC Compliance Course, CPSC and ICPHSO -- 10 Years Later, International
Consumer Product Health and Safety Organization, Orlando, Florida,
February 2003

CPSC Compliance Course, Section 15 Reporting Obligations, Panel, International
Consumer Product Health and Safety Organization, Orlando, Florida,
March 2004

Creating Safe Products--Practical Applications of Hazard Assessment,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2005

Warnings and Instructions, Human Factors Symposium, ICPHSO and CPSC,
International Consumer Product Health and Safety Organization, Bethesda,
Maryland, September 2005

<u>Introduction to Product Safety</u>, AIG UK Limited, Human Focus, Web based video Instruction Programme, Accredited by the Royal Society for the Prevention of Accidents, London, England, United Kingdom, 2007
<u>Risk Assessment</u>, AIG Consultant, Inc., New York, 2008

<u>Risk Management 101</u>, ICPHSO and CPSC Compliance and Training Seminar, International Consumer Product Health and Safety Organization, Chicago, Illinois, May 2008

<u>Publications</u>

<u>Standards, Regulations and Safety Guidelines to Protect Children from Injury</u>, Children and Injuries, Joe Frost, ed., Lawyers & Judges Publishing Company, Inc., Tucson, Arizona, 2001

Columnist, <u>Product Safety:  An In-Depth Analysis</u>, Consumer Product Safety Guide, CCH, Chicago, Illinois, 2000 - 2001

<u>Risk Analysis in Product Liability Litigation</u>, 2000 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, Aspen Law & Business, New York, 2000

<u>Protecting Our Kids - Everyone Plays a Part</u>, Forum, Consumer Attorneys of California , Volume 27, No. 10, December 1997

<u>Forensic Safety Analysis:  Investigation and Evaluation</u>, 1996 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, John Wiley & Sons, Inc., New York, 1996

<u>The Role of the Safety Analyst in Product Liability Litigation</u>, Trial Diplomacy Journal, Vol. 18, No. 2, March/April 1995

<u>Safety Management and the Consumer Product Safety Commission</u>, Professional Safety, Vol. 36, No. 4, April 1991

<u>ATVs -- The Hidden Danger</u>, Journal of Law, Medicine and Health Care, Vol. 17, No. 1, Spring, 1989

<u>Private Causes of Action Under the Consumer Product Safety Act</u>, Trial Lawyers Quarterly, Vol. 17, No. 1, 1985

<u>Administrative Civil Penalties Are Here To Stay, But How Should They Be Implemented</u>?  Wm. F. Kitzes and David Schmeltzer, American University Law Review, Vol. 26, No. 4, Washington, D.C., 1977

<u>Substantial Hazards in Consumer Products</u>, (Investigators Manual), Wm. F. Kitzes, U.S. Consumer Product Safety Commission, 1977

Depositions / Trials--Wm. F. Kitzes

The list of deposition testimony below includes cases since December of 2005.
I have done my best to assemble a reasonably complete list.  I cannot state with certainty
that the list includes every deposition I have given, but I believe it includes the substantial
majority.  Cases that include both deposition and trial testimony are indicated with a
(D & T).  Trial testimony not preceded by deposition in the last four years appears at the end
of this list.

| | | |
|---|---|---|
| 12/09 | Anthony Klein<br>Bakersfield, CA | Richard B. Holt v. Yamaha Motor Corporation<br>U.S.A. et al.<br>Superior Court of the State of California in and<br>for the County of Orange<br>Case No. 06CC11291 |
| 11/09 | H. Grady Chandler<br>Dallas, TX | David Moran et al. v. James Decker, Jerry<br>Decker, Electrolux Home Products, Inc., and<br>Sears, Roebuck and Co.<br>In the Circuit Court of Clay County, Missouri<br>Case No. CV 1028784CC |
| 11/09 | Kimberly Lambert<br>Pensacola, FL | Jacklyn McMahon et al. v. Yamaha Motor<br>Corporation U.S.A. et al.<br>In the Circuit Court of Montgomery County,<br>Alabama<br>Case No. CV-08-360 |
| 11/09 | Chadwick Gardner<br>Louisville, KY | Kenneth and Sandra Kininmonth et al. v.<br>HO Sports Company, Inc., et al.<br>Jefferson Circuit Court Division Seven<br>No. 07-CI-08539 |
| 10/09 | Anthony Klein<br>Bakersfield,CA | Karen Kelley and Patrick Kelley v. Yamaha<br>Motor Corporation, U.S.A., et al.<br>Superior Court of the State of California in and<br>for the County of San Francisco<br>Case No.  CV-2006-412 |

| 9/09 | Troy Rafferty<br>Pensacola, FL | In Re:  Yamaha Rhino Litigation<br>Laskowski, McTaggart, Miller<br>State Court, Gwinnett County, Georgia<br>Master File No.:  09-C-08254-2 |
|------|-------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------|
| 9/09 | John Uustal<br>Fort Lauderdale, FL | <u>Hortensia Palmira Garcia et al. v. Ford</u><br><u>Motor Company</u><br>In the Circuit Court of the 17th Judicial<br>Circuit in and for Broward County, Florida<br>Case No.  06-218 (14) |
| 9/09 | Henry Didier, Jr.<br>Orlando, FL | <u>Edward Louis Caslin v. Personal Care</u><br><u>Products, Inc.</u><br>United States District Court Middle District<br>of Florida Orlando Division<br>Case No.  6:08-CV-1275-ORL-35DAB |
| 9/09 | Lea Player<br>Louisville, KY | <u>Violet Barrentine, et al v. Home Depot, USA,</u><br><u>Inc., et al.</u><br>United States District Court<br>Western District of Kentucky at Louisville<br>No.  3:07CV-315-M |
| 8/09 | Robert Baker<br>Parkland, FL | <u>Daniel Perez et al. v. Yamaha Motor</u><br><u>Corporation, U.S.A et al.</u><br><u>Nicolette Archer et al. v. Yamaha Motor</u><br><u>Corporation et al.</u><br>In the Circuit Court of the 15th Judicial<br>Circuit in and for Palm Beach  County, Florida<br>Case No.:  50 2006 005301XXXXMB |
| 8/09 | William Turley<br>San Diego, CA | <u>The Estate of Richard M. Metcalfe, II, et al. v.</u><br><u>Yamaha Motor Corporation, U.S.A., et al.</u><br>Superior Court of the State of California<br>In and For the County of San Diego<br>Case No.:  GIC 842234 |

| | | |
|---|---|---|
| 7/09 | Richard Sullivan<br>Wellesley, MA | <u>A.I.M. Mutual Insurance Company, as</u><br><u>Subrogee of the Estate of David Prior v.</u><br><u>Massey Ferguson Manufacturing, Ltd., and</u><br><u>AGCO Corporation</u><br>United States District Court, District of<br>Massachusetts<br>No. 08-10844-PBS |
| 7/09 | Peter Williamson<br>Woodland Hills, CA | <u>Evelyn Rosa and Robert Rosa, et al. v. City</u><br><u>of Seaside and Seaside Police Department,</u><br><u>Taser International, Inc., et al.</u><br>United States District Court, Northern District<br>of California<br>Case No.:  C 05-03577 JF/HRL |
| 7/09 | Warren Paboojian<br>Fresno, CA | <u>Alice Holmes and Vernon Holmes v. Home</u><br><u>Depot USA, Inc.; MTD Products, Inc.; Briggs</u><br><u>& Stratton Corporation; Walbro Corporation</u><br><u>et al.</u><br>United States District Court, Eastern District of<br>California, Fresno Division<br>No. 1:06-CV-11527-SMS |
| 7/09 | Kimberly Lambert<br>Pensacola, FL | <u>Johnny Ray et al. v. Yamaha Motor</u><br><u>Corporation, U.S.A. et al.</u><br>In the District Court of Orange County,<br>Texas, 163rd Judicial District<br>No. B070626-C |
| 6/09 | Stephen Echsner<br>Pensacola, FL | <u>Jacqueline Ann Kane et al. v. Landscape</u><br><u>Structures, Inc., et al.</u><br>In the State Court in and for Gwinnett<br>County, Georgia Civil Division<br>Civil Action No. 08C-04809-2 |
| 6/09 | Brett Weinberg<br>Miami, FL | <u>Jose Osvaldo Jimenez v. Home Depot,</u><br><u>U.S.A., Inc. et al.</u><br>In the Circuit Court of the 11th Judicial<br>Circuit in and for Miami-Dade County,<br>Florida<br>Case No:  04-17174CA-02 |

| 4/09 | Peter Kaufman<br>Pensacola, FL | <u>Linda M. Donnelly v. Medline Industries,</u><br><u>Inc. et al.</u><br>In the United States District Court for the<br>Northern District of Florida<br>Case No. 1:08-cv-00124 SPM-AK |
|------|------|------|
| 4/09 | David Lira<br>Los Angeles, CA | <u>Natalya Kalinyuk et al. v. Costco Wholesale</u><br><u>Corporation, et al.</u><br>Superior Court of the State of California<br>for the County of Los Angeles<br>No. BC 388441 |
| 4/09 | Matthew Biegert<br>New Richmond, WI | <u>Harland F. Coulter v. Victory Fireworks, Inc.</u><br><u>et al.</u><br>State of Wisconsin, Circuit Court,<br>Milwaukee County<br>Case No. 07-CV-55, Case Code: 30101 |
| 4/09 | Edward Willer<br>Chicago, IL | <u>Susan Calles, et al. v. Scripto-Tokai</u><br><u>Corporation et al.</u><br>In the Circuit Court of Cook County,<br>Illinois County Department - Law Division<br>Case No. 07 L 4577 |
| 2/09 | Rick Alvis<br>Birmingham, AL | <u>Jonathan Wallace et al. v. Housing</u><br><u>Authority of Guin, et al.</u><br>In the Circuit Court of Marion County,<br>Alabama<br>CV-07-35 |
| 1/09 | Barry Rooth<br>Merrillville, IN | <u>Joseph Wright and Stacy Wright v.</u><br><u>Indiana University Northwest, et al.</u><br>State of Indiana, County of Lake<br>In the Lake County Superior Court<br>Civil Division 5<br>Sitting at Hammond, Indiana<br>Cause No. 45D05-0310-CT-266 |

| | | |
|---|---|---|
| 10/08 | David Huber<br>Chicago, IL | <u>Carl Carreno v. Ledraplastic S.P.A., et al.</u><br>In the Circuit Court of Cook County,<br>Illinois County Department - Law Division |
| 10/08 | Doug Morris<br>Prospect, KY | <u>Travis Wayne Fiveash v. Honda of South</u><br><u>Carolina Mfg., Inc. et al.</u><br>United States District Court<br>Western District of Kentucky at Owensboro<br>Case No. 05-177-M |
| 9/08 | Stuart Singer<br>Fort Lauderdale, FL | <u>William Eccles v. Robert Bosch Tool Corp.</u><br><u>et al.;</u>  C.A. NO. 08-CA 11771RWZ<br><u>John Kent v. Robert Bosch Tool</u><br><u>Corp. et al;</u>  C.A. NO. 06-DV-11000-RWZ<br><u>Charles Trombly v. Robert Bosch Tool</u><br><u>Corp. et al.</u> Middlesex Superior Court<br>C.A. No. 2004-03507<br><br>United States District Court<br>District of Massachusetts |
| 9/08 | Michael Dettmer<br>Traverse City, MI | <u>Tamela J. Grozenski v. Munson Medical</u><br><u>Center d/b/a The Munson Child</u><br><u>Development Center</u><br>State of Michigan<br>In the Circuit Court for the County of<br>Grand Traverse<br>Case No.:  08-26332--NO |
| 8/08 | Terrence Smith<br>Teaneck, NJ | <u>Monica Rivers v. Richard P. Galler, et al.</u><br>Superior Court of New Jersey<br>Law Division:  Passaic County<br>Docket No. PAS-L-3751-06 |
| 7/08 | Nicholas Blanda<br>Lafayette, LA | <u>Timothy M. Thomas v. Razor Sharp</u><br><u>Edgemaking System, et al.</u><br>United States District Court<br>Western District of Louisiana<br>Lafayette-Opelousas Division<br>No.  6:07-CV-0826 |

| | | |
|---|---|---|
| 6/08 | James Gilman<br>Albuquerque, NM | <u>Stacy Locklear et al. v. KMart Corporation<br>et al.</u><br>In the United States District Court for the<br>District of New Mexico<br>Civ. No. 05-1191 JP/ACT |
| 5/08 | Carlos Silva<br>Miami, FL | <u>Harley Napier et al. v. Hunter Douglas,<br>Inc., et al.</u><br>In the Circuit Court of the 11th Judicial<br>Circuit In and For Dade County, Florida<br>Case No.  05-00694 CA 06 |
| 5/08 | Joe Bednarz<br>Nashville, TN | <u>Bud Lee and Cindy Lundman v.<br>Metropolitan Government of Nashville/<br>Davidson County, Tennessee, et al.</u><br>United States District Court<br>Middle District of Tennessee<br>Case No. 3:06-cv-00108 |
| 5/08 | Dane Wood<br>Phoenix, AZ | <u>Gabriela Marroquin et al.  v. Caterpillar<br>Inc. et al.</u><br>Superior Court of Arizona Maricopa County<br>No.  CV2007-007119 |
| 4/08 | Wendell Walsh<br>Mishawaka, IN | <u>Pamela A. Barton & David L. Barton v.<br>All-American Homes, LLC et al.</u><br>United States District Court for the District<br>of South Carolina Charleston Division<br>C.A. No.:  2:06-cv-02295-PMD |
| 2/08 | Jay Howanitz<br>Jacksonville, FL | <u>Scott Mayhugh v. Stein Mart, Inc., et al.</u><br>In the Circuit Court of the Fourth Judicial<br>Circuit, in and for Duval County, Florida<br>Case No.:  16-2005-CA-007944<br>Division:  CV-B |

| 1/08 | John Little<br>Jackson, TN | <u>Graco Children's Products, Inc. v. Shelter</u><br><u>Mutual Insurance Company</u><br>In the Circuit Court of Hardin County<br>State of Tennessee<br>Twenty-Fourth Judicial District<br>at Savannah<br>Case No. 3791 |
| --- | --- | --- |
| 12/07 | Marlene Wahlstrom<br>Wausau, WI | <u>Nicole E. Weckesser, by her Guardian Ad</u><br><u>Litem, D.J. Weis v. Honson Marketing</u><br><u>Group, Inc., et al.</u><br>State of Wisconsin Circuit Court Dane County<br>Case No.:  06-CV-127 |
| 10/07 | Antonio Ponvert, III<br>Bridgeport, CT | <u>Kelly Hill et al. v. U.S. Smokeless Tobacco</u><br><u>Company</u><br>Superior Court Complex Litigation at<br>Stamford<br>Docket No. X05 FST CV05 4003788 S |
| 10/07 | JR Hullverson<br>St. Louis, MO<br>(D & T) | <u>Sharon Fiedler, et al. v. Bobby Fultz, and</u><br><u>State Farm Insurance Company,</u><br><u>Daimler Chrysler et al.</u><br>In the Circuit Court of the City of St. Louis<br>State of Missouri<br>Cause # 042-8877 Div. #1 |
| 9/07 | Kirk Wolden<br>Sacramento, CA | <u>Elizabeth Sanchez, for herself and on behalf</u><br><u>of those similarly situated, v. WalMart</u><br><u>Stores, Inc., Dorel Juvenile Group, Inc., and</u><br><u>DOES 1 through 25, inclusive</u><br>United States District Court, Eastern District<br>of California<br>Case No. 2:06-CV-02573-DFL KJM |
| 8/07 | Barry Russell<br>Des Moines, IA | <u>Imogene Calcaterra-Lepique et al. v. QEP</u><br><u>Co., Inc., et al.</u><br>In the United States District Court Eastern<br>District of Missouri Eastern Division<br>Case No. 4:06:CV1050 CAS |

| 8/07 | Ashley Ogden<br>Jackson, MS | <u>Joe Dear and Darlene Moore, et al. v.</u><br><u>American Honda Motor Company, Inc.,</u><br><u>and Robert Moore</u><br>In the Circuit Court of the First Judicial<br>Circuit in and for Rankin County, Florida<br>Cause No. 2004-325 |
| 7/07 | Matthew Tanner<br>Chicago, IL | <u>Felice Shinneman v. Procter & Gamble</u><br><u>Pharmaceuticals, Inc., Walgreen Co., et al.</u><br>In the Porter County Superior Court, State<br>of Indiana, County of Porter<br>Cause No. 64D05-0108-CT-6480 |
| 5/07 | Stephen Echsner<br>Pensacola, FL | <u>Lee Michael Avent v. Phoenix V</u><br><u>Condominium Association, Inc., et al.</u><br>In the Circuit Court of Baldwin County,<br>Alabama<br>Civil Action No.:  CV-2006-464 |
| 4/07 | Marc Ginsberg<br>Miami, FL | <u>Ramirez v. Bajer Design and Marketing,</u><br><u>Inc.</u><br>In the Circuit Court of the 11th Judicial<br>Circuit in and for Miami-Dade County,<br>Florida<br>Case No.:  06-3567 CA 32 |
| 2/07 | Clark Batten<br>Lexington, KY<br>(D & T) | <u>Blakeman v. Electrolux Home Products, Inc.</u><br>Commonwealth of Kentucky, Mercer<br>Circuit Court<br>Case No. 05-CI-00132 |
| 2/07 | Richard Rice<br>Kansas City, MO | <u>Whittaker v. Brass Eagle</u><br>In the Circuit Court of Jackson County,<br>Missouri at Kansas City<br>Case No. 0516-CV29369 |

| | | |
|---|---|---|
| 11/06 | Joe Bednarz<br>Nashville, TN<br>(D & T) | Michael G. Shotts, Jr. v. Bombardier, Inc.,<br>et al.<br>United States District Court, Southern<br>District of Indiana, Indianapolis Division<br>Cause No. 1:05-CV-1049 |
| 11/06 | Briggs Smith<br>Batesville, MS | Stephens v. LaJobi Industries, Inc.<br>In the Circuit Court of Second Judicial<br>District Panola County, Mississippi<br>No. CV2004-124-LP2 |
| 9/06 | Justin Johnson<br>St. Petersburg, FL<br>(D & T) | Zunner v. Florida Pool Products, Inc.,<br>WalMart Stores, Inc and Manatech<br>Plastics, Inc. d/b/a Continental Plastics<br>In the Circuit Court of the Sixth Judicial<br>Circuit of the State of Florida, in and for<br>Pinellas County<br>No.  00-008744 |
| 9/06 | Carl Grayson<br>Edgewood, KY<br>(D & T) | Goff v. Daisy<br>Commonwealth of Kentucky, Green Circuit<br>Court, Division No. 1<br>Civil Action No. 03-CI-00140 |
| 8/06 | Chris Vlachos<br>Pensacola, FL | Romans v. Sears<br>In the Circuit Court in and for Santa Rosa<br>County, Florida<br>Case No. 04-000641-CA |
| 8/06 | William Rankin<br>Pensacola, FL | Davidson v. Sears<br>In the Circuit Court of the 1st Judicial<br>Circuit in and for Walton County, Florida<br>Case No. 05-000004 |
| 7/06 | Stephen Echsner<br>Pensacola, FL | Collins v. Dollar Tree Stores, Inc., and<br>Dollar Tree Distribution, Inc.<br>In the Circuit Court In and For Escambia<br>County Florida<br>Case No.  2004-CA-002254 |

| | | |
|---|---|---|
| 7/06 | Darrell Scott<br>Spokane, WA | <u>Nemri v. Martha Stewart Living Omnimedia</u><br><u>Inc. and KMart Corporation</u><br>In the Superior Court of the State of<br>Washington for the County of Spokane<br>No. 05200332-9 |
| 7/06 | Adrian Soud<br>Jacksonville, FL | <u>Gottshall v. Kasam Hospitality</u><br>In the Circuit Court of the Fourth Judicial<br>Circuit, in and for Duval County, Florida<br>Case No.:  16-2004-CA-8514-XXXX-MA<br>Division:  CV-D |
| 7/06 | Stan Koop<br>Oklahoma City, OK | <u>Kirtley v. DeLonghi America, Inc, DeLonghi</u><br><u>S.p.A</u><br>In the United States District Court for the<br>Western District of Oklahoma<br>Index No. CIV 05-0586C |
| 6/06 | Gary Gober<br>Nashville, TN | <u>Spicer v. The Brinkmann Company</u><br>In the United States District Court for the<br>Middle District of Tennessee Nashville<br>Division<br>No.  3:05-0378 |
| 5/06 | Steve Browning<br>Jacksonville, FL | <u>Fitz v. Mau</u><br>In the Circuit Court, Fourth Judicial Circuit,<br>in and for Clay County, Florida<br>Case No.:  2004-CA-1095<br>Division:  A |
| 4/06 | Terrence McCartney<br>New York, NY | <u>Malo v. Weissner et al.</u><br>Superior Court of New Jersey Law Division:<br>Essex County<br>Docket No. ESX-L-9062-02<br>Docket No. ESX-L-9067-02 |

| | | |
|---|---|---|
| 3/06 | Tom Guelzow<br>Eau Claire, WI | <u>Schnack v. Carter Brothers</u><br>State of Wisconsin Circuit Court<br>Eau Claire County Branch II<br>Case No.  05CV86 |
| 3/06 | Paul D'Amato<br>Linwood, NJ<br>(D & T) | <u>Masterson v. B.J. Stores, Inc. Sunspecs of</u><br><u>Ocean City, Inc</u><br>United States District Court for the District<br>of New Jersey<br>Camden Vicinage<br>Civil Case No.:  1:03-cv-3202 |
| 2/06 | Tom Conway<br>Louisville, KY | <u>Linker v. Nikota USA and Pep Boys</u><br>Jefferson Circuit Court Civil Branch<br>Division Four<br>No. 04-CI-06979 |
| 12/05 | John Merritt<br>Little Rock, AR | <u>Dorr v. Yamaha Motor Corp. USA</u><br>In the United States District Court for the<br>Eastern District of Arkansas<br>Case No.:  4-05-CV00683GH |

4/06        Lopez v. Kawasaki, State Court, Middlesex County, New Jersey  (T)