**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| **IN RE: YAMAHA MOTOR CORP. RHINO ATV PRODUCTS LIABILITY LITIGATION** | **Master File No. 3:09-MD-2016-JBC MDL No. 2016** |
| _____ | |
| **THIS DOCUMENT RELATES TO ALL CASES** | **JENNIFER B. COFFMAN, U.S. DISTRICT JUDGE** |

**MEMORANDUM OPINION AND ORDER**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending before the court are the plaintiffs' motions to exclude the testimony of Robert Larson, R. 2364, Eddie Cooper, R. 2364, and Kevin Breen, R. 2434. Also pending are the motions of defendants Yamaha Motor Co., Ltd., Yamaha Motor Corp., U.S.A., and Yamaha Manufacturing Corp. of America (collectively "Yamaha") to exclude the proposed testimony of James Williams, R. 2371, Catherine Downs, R. 2370, William Kitzes, R. 2369, and Ronald Carr, R. 2372.

This is a products-liability MDL involving an off-road vehicle called the "Rhino" that is designed, manufactured, marketed, and distributed by Yamaha. The plaintiffs in these cases allege that the Rhino was defectively designed and that the defects caused them injury. Although the precise mechanism of injury varies across cases, in general the plaintiffs allege that the Rhino rolled over unexpectedly, causing crushing injuries to their extremities.These cases were consolidated within this MDL by the Judicial Panel on Multidistrict Litigation on February 13, 2009. R. 1.

1

The pending *Daubert* motions present a variety of complex issues, some of which are appropriately before this court and others that will be left for the various transferor courts after remand. First, it is important to note that although the Federal Rules of Evidence and the requirements of *Daubert* will apply to all cases, each case will be governed by state substantive laws. To the extent these laws vary, considerations such as the relevance of the challenged testimony can vary as well. *See In re Diet Drugs Products Liability Litigation*, 2000 WL 876900 (E.D. Pa. June 20, 2000). Second, in several cases, the expert opinions challenged depend upon the facts in each particular case. Some experts have not fully formulated their opinions, but rather have provided a sketch of how they will go about formulating their opinions once presented with a specific case. The court addressed these issues at the start of the *Daubert* hearing held on August 2-3, 2011, and encouraged the parties to indicate whether any of the motions would be more appropriately heard by the transferor courts. The court also reminded the parties that the failure to file *Daubert* motions in anticipation of the hearing was without prejudice to their right to file a non-duplicative motion after remand. Finally, at the close of the hearing, the court gave the parties the opportunity to file supplemental responses and replies to all motions under consideration. R. 2603.

### a.  Robert Larson

The plaintiffs have moved to strike a portion of the testimony offered by Robert Larson. The plaintiffs are not challenging Larson's qualifications, but rather the

methodology and design of a particular test that underlies a portion of his opinions. For the reasons discussed below, the motion will be denied.

Robert Larson is an engineer at Exponent, an engineering and scientific consulting firm that, among other things, conducts third-party vehicle tests and accident reconstructions. At Yamaha's request, Larson ran a series of tests on the Rhino to determine whether a rollover crash would cause an occupant's limbs to leave the passenger compartment of the vehicle. The plaintiffs challenge the portion of Larson's testimony that is based on the results of these tests, known as the sled tip-up tests ("STU tests"). In the test, Larson placed two crash test dummies in a Rhino 660 and attached the Rhino to a movable "sled." The sled was accelerated to 27 mph laterally (i.e., it moved sideways) and then brought to a stop using brakes on the sled, at which point the Rhino's momentum would tip it over. The positions of the dummies after the crash were then photographed.

The plaintiff's primary challenge to the STU tests relates to Eddie Cooper's later use of it in his seatbelt analysis (discussed below). Indeed, although the plaintiffs spend most of their brief criticizing the STU tests, the vast majority of it is inapplicable to Larson at all. The only portion that could be said to criticize *Larson*'s methodology or proposed testimony is the plaintiffs' challenge to the Rhino's lateral movement. R. 2364 at 9-10.

Larson's methods are acceptable under *Daubert*. Sled testing is a well-accepted method of analyzing vehicle performance during an accident. *Public Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1254 (D.C. Cir. 2004). Larson clearly documented his methods and results and explained his reason for choosing a sideways sled orientation. The

3

plaintiffs' critique of this method is nothing more than a vague, unsupported suggestion that the sled's orientation might overstate the forces acting on the seatbelt. This criticism has nothing to do with the conclusions reached by Larson regarding occupant containment. To the extent this element may relate to occupant containment, the plaintiffs will be free to inquire into it on cross-examination, but it does not call the reliability of his methods into question.

### b.  Eddie Cooper

The plaintiffs have moved to strike the testimony of Eddie Cooper. They are not challenging Cooper's qualifications, but rather the methodology and design of certain tests that underlie his opinions.  For the reasons discussed below, the motions will be denied in part, without prejudice to their reassertion in the transferor courts.

Eddie Cooper is the Chief Technical Officer of B33 Consulting, Inc. He specializes in "failure analysis of vehicles, vehicle components, and vehicle systems." R. 2437, Exh. A at 12. Specifically, Cooper is an expert in seatbelt design, construction, and evaluation. At Yamaha's request, he conducted a series of tests on the Rhino's seatbelt system. These included a retractor lock-up test and a belt load study. Cooper also proposed a series of case-specific tests including belt-fit and inversion studies. In addition, he analyzed the seatbelts used in Larson's STU tests.

In his report, Cooper reached several global conclusions. He found (1) that the seatbelts used in the Rhino were not defectively designed and provided "reasonably safe occupant restraint;" (2) that the Rhino's cinching latch plate in conjunction with the "web-sensitive-only retractor" was appropriate; (3) that the retractor is not prone to

4

excessive payout, and (4) that the "geometry of the anchorages for the Yamaha Rhino seat belt system does not allow excessive excursion of the occupant or otherwise result in an unsafe design."

In their brief, the plaintiffs primarily challenge Cooper's use of the STU tests in his seatbelt analysis. According to the plaintiffs, the STU tests "provide Mr. Cooper with the necessary foundation for his opinions in this case, namely that there will be marks on the webbing of the seat belt as a result of use after a rollover. Testimony concerning these tests and their purported results, which Mr. Cooper has used as the sole basis for his testimony in every case he has been retained with the exception of one in which the occupants were both unbelted, should be excluded. . . ." The remainder of the plaintiffs' brief is dedicated almost exclusively to the STU tests. At the *Daubert* hearing, however, the plaintiffs shifted focus to Cooper's underlying premise that he can determine whether an occupant was wearing his seatbelt based on marks found on the belt's webbing. According to the plaintiffs, "What we are challenging on Mr. Cooper is his technique, which is to look for the presence of what he calls loading marks on the actual seat belt webbing."

Yamaha defends Cooper's use of the STU test and contends that the plaintiffs' objections to Cooper's opinions regarding "loading marks" are premature. With respect to Cooper's reliance on the STU tests, Yamaha notes that the tests form only a portion of the basis for Cooper's opinions. His conclusions about the use (or non-use) of a seatbelt in any particular case will be based on several tests and studies, says Yamaha, not just the STU test results. Yamaha also notes the long history of using sled testing in the automotive and vehicle industries and argues that the plaintiffs' primary criticism of

the tests as they relate to Cooper – that the seatbelts were not instrumented – is a "red herring." R. 2437 at 20 ("[W]hen a Rhino occupant moves laterally, they engage the hip restraint attached to the seat, which reduces the lateral acceleration and thus the belt loads. If, however, some of that lateral acceleration is transferred forward (or longitudinally), the load forces on the belt will be higher, making it even more likely that belt loading marks will be created.").

Yamaha also emphasizes that Cooper's testimony is highly dependent upon case-specific factors. Cooper's "seat belt use and performance opinions, and the methods he uses to arrive at them, are driven by the facts of a particular case. . . . In each individual case, Cooper performs detailed vehicle and belt inspections. . . conducts surrogate studies (when appropriate), and reviews pertinent testimony, witness statements, accident reports, medical records, and other physical evidence in and around the incident location, where available." *Id.* at 3, 6.

This court agrees that any analysis of Cooper's testimony is premature. Despite the plaintiffs' initial claims to the contrary, it is apparent that his testimony is based upon a multitude of sources, not just the STU tests. In addition, many of the sources underlying his opinions are, at present, hypothetical. When presented with a particular accident, Cooper intends to conduct a "surrogate study" in which a person of similar build and size is placed in a Rhino to determine how a seatbelt would have fit on the occupant. Cooper also intends to carefully examine the actual seatbelt at issue. Based on these examinations, Cooper suggests that he will be able to form a conclusion as to whether a seatbelt was worn. Because he has not fully formed his case-specific opinions, analyzing whether his testimony meets the requirements of *Daubert* is an

exercise in futility. As Yamaha notes, "Plaintiffs are asking the Court to exclude case-specific opinions that have not yet been formulated or fully stated in any pending MDL case, and as to which Cooper has not yet had the opportunity to render a complete case-specific report that lays out his analyses and methodologies. Cooper's case-specific opinions can only be evaluated after he has analyzed specific accident facts and enumerated his opinions in the context of a specific case." *Id.* at 4.

The court will likewise withhold judgment on Cooper's "common" opinions. Given the attention paid to the particulars of Cooper's case-specific opinions, the parties have (understandably) given this line of testimony short shrift. Further, like his case-specific opinions, Cooper's common opinions could change or shift in the context of a particular case. Given this, a transferor court will be in a better position to analyze these statements.

### c. Kevin Breen

The plaintiffs have moved to strike certain portions of the testimony offered by Kevin Breen. The motion will be granted in part and denied in part.

Breen is an expert in off-road vehicle handling and operation. In his report, Breen opines on a variety of topics including the tires, suspension, steering, stability, and handling of the Rhino. The plaintiffs do not challenge this testimony. Rather, they challenge four specific categories of testimony offered by Breen: "'warnings,' 'occupant containment,' quantitive accident rates, and certain CPSC investigations." R. 2434 at 1. The plaintiffs allege that testimony on these topics will be unnecessarily cumulative of the testimony of other experts, that Breen is insufficiently qualified to testify regarding

7

these topics, and that his basis for this testimony is inadequate. For the reasons discussed below, the challenge to Breen's testimony as being cumulative is premature, as is the challenge to the CPSC investigations. The challenge to Breen's occupant-containment testimony fails. Breen's warning-label testimony and accident-rate testimony will be barred.

First, the plaintiffs' objection to Breen's various opinions as being cumulative is premature. Whether Breen's testimony is cumulative will depend on which experts are designated to testify in each particular case. *See Adams v Cooper Industries, Inc.,* 2006 WL 2983054 (E.D. Ky., Oct. 17, 2006) (reserving the issue of redundancy where motion was made several months before trial).  Therefore, redundancy is an issue that can best be assessed by the trial courts after remand.

The plaintiffs challenge Breen's warning label opinions on the basis that he is not qualified to discuss warning labels and because he has inadequately supported his opinions. In his report, Breen states that "there exist no defects in design, manufacture/development or warnings." R. 2434 Exh. B at 21. He also indicates  that "there is no evidence that the. . . warnings. . . are inadequate." *Id.* The plaintiffs argue that Breen's testimony on the Rhino's warnings lacks an adequate basis and is "simply a regurgitation of work done by other Yamaha experts." Yamaha counters that Breen did more than simply review another expert's finding. According to Yamaha, he "reviewed the work of and talked to Dr. Frantz" (an expert on warnings), reviewed the Rhino's warning labels and those on similar vehicles, and conducted a study that (among other things) evaluated novice riders' "understanding of certain words that could be used to communicate driving characteristics."

Breen lacks sufficient qualifications to discuss warning labels. Breen's CV nowhere suggests he has any personal experience in this area; he never describes any relevant experience in his report, and Yamaha never mentions such experience in its brief. In addition, Breen's warnings testimony lacks an adequate basis. The foundation for an expert's opinion must be both reliable and reasonable. *Trepel v. Roadway Exp., Inc.,* 194 F.3d 708, 720 (6th Cir.1999) (Suhrheinrich, J., concurring in part and dissenting in part). *See also* Fed. R. Evid. 702 (requiring an expert opinion to be "based upon sufficient facts or data" and be "the product of reliable principles and methods"). That he spoke to another expert and reviewed the labels themselves is insufficient, and Breen's novice study is irrelevant. The study was not specific to the Rhino, but rather looked at how words in general convey driving characteristics. Yamaha nowhere suggests that the Rhino's warning labels were actually used in the study. For this reason, as well as Breen's lack of qualifications, his warnings opinions will be excluded.

Next, the plaintiffs challenge Breen's testimony on occupant containment. In his report, Breen states that "[t]he overall strategy, configuration, and performance of the occupant protection system for the Yamaha Rhino is appropriate and not defective." Breen concludes that the combination of safety features in the Rhino, along with "proper use of protective apparel provides a reasonable level of protection from serious injury." According to the plaintiffs, Breen lacks the necessary qualifications to discuss occupant containment, and his testimony is inadequately supported in any case.

Breen possesses sufficient qualifications to opine on the Rhino's occupant protection system in the limited manner he does.[1] According to his testimony in the *Holt* trial, he has worked with off-road vehicles and occupant containment issues for 30 years, *see* R. 2511 Exh. B at 3; has taken courses and seminars on occupant containment; was Chairman of the SAE Special Vehicle Committee at a time when it undertook adoption of occupant protection standards; and has analyzed occupant protection systems for the government or companies four or five times.

In addition, Breen's basis for his conclusion that the Rhino's occupant protection system is appropriate is sufficiently reliable. Breen relies on his extensive experience in the off-road industry, and his evaluation of the handling and characteristics of the Rhino, as well as a study in which he analyzed whether riders would stick their legs out if a Rhino was tipped on its side. Given the narrow reach of his opinion, combined with his experience in the area, he has laid an adequate foundation for this testimony.

The plaintiffs also challenge Breen's testimony as it relates to purported accident rates. In his report, Breen suggests that the vast majority of Rhinos are used safely. The plaintiffs argue that Breen lacks an adequate basis to testify in this manner.

Breen lacks the qualifications to discuss the "accident rates" of the Rhino, and his accident rate testimony is inadequately supported. Breen used accident data from another expert and combined it with sales information from Yamaha to come up with an "accident rate." He then used this rate to speculate that the Rhino is safe. However,

---

[1] Breen's opinions of the occupant protections system are relatively narrow. He does not attempt to justify any of the complex engineering decisions that went into the design of the Rhino's occupant protection systems. Rather, he opines generally that the Rhino's occupant protection systems are appropriate to protect a rider of such a device, when used in combination with appropriate safety attire.

Breen is not a statistician, nor does he give any indication that his rudimentary formula is an accurate measure of the Rhino's actual accident rate. Although Breen has extensive experience with the performance of ATVs and UTVs, his testimony on accident rates (and his ultimate conclusion that the rates demonstrate the Rhino's safety) is outside his area of expertise and unsupported.

Finally the plaintiffs challenge Breen's testimony regarding other similar incidents investigated by the CPSC. The plaintiffs contend that evidence of other incidents is admissible only if they are shown to be "substantially similar" to the accident in question. Such substantial similarity will depend upon case-specific factors. The court cannot determine at this juncture whether there is "substantial similarity" between the Rhino and any other incident. A transferor court will be in a better position to make this determination after remand, on a case-by-case basis.

### d.  James Williams

The defendants have moved to exclude the testimony of James Williams. For the reasons discussed below, the motion will be granted in part and denied in part.

Williams is an engineer who is an expert in the engineering "design process." Yamaha argues that Williams's testimony should be excluded because he has no experience designing or evaluating off-road vehicles and because he cannot reach a conclusion about specific changes that Yamaha should have made to the design of the Rhino. Williams is amply qualified to offer general testimony regarding certain universal engineering design processes; however, certain specific opinions will be prohibited.

Williams is an engineer with over forty years of experience in the automotive industry. He currently serves as President of Williams Engineering Services, which provides "technical and engineering support services including the development and optimization of engineering processes to reduce development time and ensure product safety and quality." His expertise is in the areas of Design Failure Mode and Effects Analysis (DFMEA),[2] root cause analysis,[3] and corporate engineering auditing. Williams is also a certified ISO/TS 16949 auditor.[4]

Yamaha's primary challenge to Williams's qualifications relates to his lack of experience in the off-road vehicle industry. Yamaha emphasizes that Williams has never worked in the off-road industry, has no knowledge of the specific design processes utilized in the off-road industry, and has never designed the sorts of components at issue here.

To the extent Williams seeks to testify regarding engineering design processes, such as DFMEA and root cause analysis, Yamaha's challenge to his qualifications fail. Although Williams has no experience in the off-road industry, these processes are not unique to that industry. Yamaha has not shown why his experience in the automotive industry is not transferable, particularly in light of Williams's admission that many of the standards he describes could be applied to products ranging from ATVs to toasters. To

---

[2] DFMEA (or FMEA) is a process used whenever a new product design is created. "In a DFMEA, engineers attempt to identify and test for potential issues which may be presented by the design, redesign, or pairing of components." R. 2371, Exh. A at 4.

[3] Root cause analysis is a step-by-step process engineers follow when a complaint or failure is reported.

[4] ISO 16949 is an engineering process standard applicable to the automobile industry. It incorporates the requirements of ISO 9000/9001, a global engineering process standard that can be applied to the design of any product.

the extent Williams's lack of experience in this specific area is relevant, it can be inquired into on cross-examination.

Williams's opinions are reliable. Although Williams admittedly has no knowledge of whether off-road manufacturers routinely utilize the processes he advocates, such knowledge is irrelevant. Although Williams himself works in the automotive industry, the processes he advocates are universal.

Yamaha argues that Williams's dearth of experience makes him analogous to the expert in *Milne v. USA Cycling, Inc.* 575 F.3d 1120 (10th Cir. 2009). In *Milne,* an expert in "paved road racing" sought to testify regarding mountain bike racing. According to the court, the expert's lack of experience in the relevant field rendered his opinions mere speculation. Unlike the expert in *Milne*, however, Williams applies standards applicable to both industries. Hence, while the rules of paved road races are distinct from those of mountain bike races, here the processes Williams advocates are applicable to the field in question. Although Williams is a certified ISO 16949 auditor, a design standard applicable solely to automobiles, these standards incorporate the ISO 9001 standards, which are universally applicable.

Neither do the characteristics of Williams's audit of Yamaha render his opinion unreliable. In cases such as this, where an expert testifies from his practical experience, the key inquiry is whether the expert "is basing the testimony on 'the same level of intellectual rigor that characterizes the practice in the relevant field.'" *Busch v. Dyno Nobel, Inc.*, 40 F. App'x 947 (6th Cir. 2002) (*quoting Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999)).  According to Williams, he conducted an analysis of Yamaha's engineering processes "similar to those I have done as a certified ISO/TS 16949 auditor

13

to determine (a) the appropriateness of the design, development, and verification process undertaken by the Yamaha entities from concept through production and (b) whether the appropriate design, development, and verification steps, and, equally important, root cause analysis directed toward any necessary corrective action was undertaken once the Rhino entered production and sale."

Yamaha also objects on the grounds that Williams reviewed only those documents provided to him by plaintiffs' counsel; that he failed to speak to any of Yamaha's engineers; and that he is not a certified external auditor. First, Williams utilized sufficiently reliable data in performing his audit.[5] According to Yamaha, Williams's audit "consisted merely of his review of a small subset – six bankers boxes – of the millions of documents Yamaha had produced." R. 2371 at 19. Yamaha likewise objects that the documents in question were "hand-picked" by plaintiff's counsel. However, a review of the deposition testimony cited by Yamaha reveals that although the first batch of documents reviewed by Williams was selected by (or at least, delivered by) the plaintiffs' counsel, Williams then requested other documents that he needed to complete his audit. R. 2435 Exh. C at 17:4-13; 37:4-17. Second, although Yamaha critiques Williams's failure to interview Yamaha's engineers, it neglects to indicate what relevance such failure has to the reliability of Williams's audit, let alone how such a procedure would be possible in the midst of litigation. Such a failure, if indeed it is one, can be inquired into on cross-examination. Last, Yamaha argues that Williams's opinion is unreliable because he is not a certified external auditor. Although Williams admits that

---

[5] Although Yamaha cites several cases for the proposition that the basis for an expert's opinion must be reliable, its objections here primarily concern the *volume* of evidence Williams reviewed.

14

he is certified solely in internal auditing, not external auditing, "the auditing process is the same, and so the type of things that I do are no different than what they do." R. 2371 Exh. B at 240:11-18. According to Williams, internal audits are performed in anticipation of possible external audits, so the requirements of the two are purposefully similar. In any case, Yamaha points to no actual deficiencies in Williams's audit. The fact that Williams is not a certified external auditor goes to weight, not admissibility; it is not a basis for striking Williams's testimony.

Yamaha also objects to Williams's testimony as being unhelpful and irrelevant. According to Yamaha, Williams's testimony is unhelpful because it is "not connected to any concrete outcome or issue." Specifically, although Williams testifies that Yamaha failed to implement adequate design processes, he cannot link this failure to any specific engineering changes that would have been made. Indeed, as Williams testified, the processes he advocates "lead[] to further steps," rather than to a concrete change in the Rhino.

In analyzing how Yamaha engineered the Rhino, inquiry into its design process will be relevant. According to Williams, if the processes he advocates are followed, "a vast majority of. . . safety-related incidents [] will not occur." Furthermore, although Yamaha now rejects discussion of these processes as "unhelpful," Yamaha attempted to follow, or agreed to follow, the majority of them at some point in the development of the Rhino. Yamaha is certified under ISO 9001, which forms the basis of ISO 16949.[6] In addition, Yamaha considered performing a DFMEA in developing the Rhino, and certain engineers testified that they actually performed a DFMEA. Hence, the processes

---

[6] According to the plaintiffs, the primary requirement distinguishing ISO 9001 from ISO 16949 is the performance of a DFMEA.

15

Williams describes in his report are not simply an idealized list -- they are methods that Yamaha itself purported to follow. The question of whether Yamaha followed its own prescriptions is relevant to the defect inquiry.

Finally, Yamaha also objects to two "miscellaneous" opinions offered by Williams. Specifically, Yamaha objects to Williams's proposed testimony "(i) that Yamaha, prior to the sale of the Rhino, should have foreseen certain misuse and safety-related problems and (ii) that Yamaha should have implemented its 2007 'fix' of installing doors on the Rhino earlier in time and differently in nature." Although its objection to the first statement fails, Yamaha is correct that Williams is unqualified to render this latter opinion.

With respect to Williams's foreseeability opinion, Yamaha objects that it "is nothing but a legal conclusion."  Although it is true that " testimony offering nothing more than a legal conclusion – i.e, testimony that does little more than tell the jury what result to reach – is properly excludable under the Rules [of Evidence]," *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997), this opinion is not such testimony. In his report, Williams indicates that it "was readily foreseeable to Yamaha during the design, development, and verification process" that users of the Rhino would "misuse" in certain ways, including by riding without proper safety gear or on inappropriate surfaces. This testimony, while possibly objectionable on other grounds, is not an impermissible legal conclusion. *See Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir. 1994). The DFMEA process advocated by Williams (and arguably adopted by Yamaha) requires designing engineers to "identify and test for potential issues which may be presented by the design" in order to "identify all possible failure modes of the product." *See also* R. 2615

16

at 170 (Transcript of *Daubert* Hearing) (indicating that engineers performing a DFMEA ask themselves "what could go wrong? what are the bad outcomes that could happen here? How could people get hurt?"). The factual issue of whether Yamaha foresaw the potential "misuses" of the Rhino is a relevant topic for expert testimony distinct from the ultimate question of whether the Rhino was defectively designed or whether Yamaha acted reasonably in designing the Rhino.

Williams is unqualified to give an opinion regarding Yamaha's 2007 door installation program. By his own admission, Williams is an expert in the design process. His CV and report suggest no experience (let alone expertise) in the area of product recalls. The plaintiffs' rejoinder – that this opinion is not a legal conclusion – is inapposite. This testimony is inadmissible under *Daubert*.

### e. Catherine Downs

Yamaha has moved to strike the testimony of Catherine Downs. Downs is a former compliance officer and deputy director at the Consumer Product Safety Commission. For the reasons discussed below, Yamaha's motion will be granted.

Downs proposes to testify that Yamaha had an obligation under Section 15(b) of the CPSA to report certain hazards associated with the Rhino to the CPSC. Section 15(b) of the CPSA requires a manufacturer to "immediately inform" the CPSC when it "obtains information which reasonably supports the conclusion that [its] product . . . contains a defect which could create a substantial product hazard" or "creates an unreasonable risk of serious injury or death." 15 U.S.C. § 2064(b). According to Downs, "A careful, concerned and prudent manufacturer would have, and was required to, in

2004, 2005, 2006, 2007, and certainly 2008, alert CPSC under section 15(b) of the CPSA to the number and scope of incidents and to the types of injuries involved." R. 2370, Exh. A at 12 (Downs's Expert Report). This testimony is irrelevant, unreliable, and would likely confuse the jury in its fact-finding mission.

Yamaha first claims that Downs is unqualified to discuss its § 15(b) reporting duties. The plaintiffs respond that Downs's experience at the CPSC renders her more than qualified "to issue her opinions regarding corrective action plans or recalls in general and the reasonably prudent manufacturer standard."

Downs has worked "in the field of consumer product safety" since January 1972. She began working at the Food and Drug Administration, in a division that subsequently became the CPSC, in 1973. At the CPSC she served as a compliance officer and deputy director for Section 15(b) recalls in the Recalls and Compliance Division. Downs was "responsible for accepting Section 15(b) industry reports and for guiding the reporting firm through the corrective action process." According to Yamaha, at the CPSC, Downs "dealt with cases that had *already* been reported. . . . Downs was not responsible for determining whether companies timely complied with § 15(b)."

To the extent that testimony on the CPSC and CPSA is admissible, Downs is qualified to give it. She has extensive experience at the CPSC, where she served as a compliance officer and deputy director. Although she may not qualify under the traditional scientific-based approach, she does qualify as an experience-based expert. *See In re Stand 'N Seal, Products Liability Litigation*, 2009 WL 1772585 (N.D. Ga. 2009) (admitting Downs as an expert witness on the issue of negligent recalls.).

18

Downs's testimony will not assist the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702. Despite the characterization given by the plaintiffs, her overriding opinion, expressed throughout her report, is that Yamaha had a duty to report under Section 15(b) of the CPSA, yet failed to do so. This opinion is irrelevant to any issue that a jury will be deciding in any of these cases.

The testimony Downs proposes in her report and the testimony the plaintiffs describe in their briefs differ considerably. According to the plaintiffs, Downs's testimony will assist the jury in its determination of whether Yamaha reacted reasonably in response to information that the Rhino was causing injury to users. The plaintiffs indicate that "Ms. Downs' opinions as to the responsibilities of a reasonable manufacturer are distinct from the very narrow ultimate timeliness decision required to implement civil and/or criminal penalties made by the legal department." This hypothetical opinion is far from the actual opinion issued by Downs.

In her report, Downs makes it abundantly clear that she believes, and will testify, that Yamaha violated Section 15(b) of the CPSA. Downs indicates that "[t]he purpose of the report is to provide an opinion regarding whether Yamaha Motors, U.S.A., et al had an obligation under Section 15(b) of the Consumer Product Safety Act to report to the Consumer Product Safety Commission, prior to March 2009, hazards associated with the Rhino." Her opinion is that Yamaha violated 15(b), and this opinion is emphasized throughout her report. *See id.* at 6 ("collectively, at this point, under section 15 (b) of CPSA, it was Yamaha's obligation to report to CPSC that the Rhino presented a substantial product hazard. . ."); *id.* at 7 ("Yamaha had an obligation under the law. . ."); *id.* at 8 ("they had an obligation under the law to make a section 15(b) report. . ."; *id.* at 9

("Yamaha had an obligation under the CPSA to report. . ."); *id.* at 10 ("[h]ad Yamaha reported to CPSC, as required by law. . ."); *id.* at 12 ("Yamaha was required to file a Section 15(b) report. . .").

In their briefing, the plaintiffs attempt to construe Downs's report as opining on the "prudent manufacturer" standard. However, a cursory review of her report reveals that her purpose was not to provide an opinion regarding whether Yamaha acted reasonably -- it was to provide an opinion on Yamaha's obligations under § 15(b). To the limited extent that Downs mentions the responsibilities of a "prudent manufacturer," it is apparent that she sees this term as coextensive with the requirements of 15(b). *Id.* at 12 ("A careful, concerned and prudent manufacturer would have, and was required to, in 2004, 2005, 2006, 2007, and certainly 2008, alert CPSC under section 15(b) of the CPSA."). However, as discussed below, Downs disclaims the ability to make the predicate determinations of 'defect' and 'substantial hazard' necessary to trigger § 15(b).

Whether Yamaha violated the requirements of the CPSA is irrelevant. The CPSA provides no private right of action, *Daniels v. American Honda Motor Co., Inc.*, 980 F.2d 729 (6th Cir. 1992) (Table), and proof that Yamaha violated the CPSA would not advance any of the plaintiffs' claims against Yamaha. The plaintiffs in this case have alleged that the Yamaha Rhino was defectively designed. They have not alleged negligent recall or any other claims for which the reporting requirements of the CPSA

might be relevant. *See In re Stand 'N Seal, Products Liability Litigation*, 2009 WL 1772585 (N.D. Ga. 2009) (a negligent recall MDL in which Downs testified.).[7]

Although the 15(b) reporting requirements are triggered by a finding of "defect" and "substantial hazard," 15 U.S.C. § 2064(b), Downs has explicitly disclaimed that she ever made any such findings with respect to the Rhino.[8]  R. 2370, Ex. B, 125:19-22 ("Q. Now, you've never – you never determined whether a defect actually exists in the Rhino, correct? A. I did not make that determination."). *See also id.* at 13-14. Hence, Downs's opinion is not only about Yamaha's duties under a law that is not at issue, but she is unable to make the threshold determination necessary to trigger the law's requirements. For both reasons, her testimony is irrelevant.

Assuming Downs sought to testify to the "reasonably prudent manufacturer standard" as plaintiffs now assert, rather than the requirements of §15(b), her testimony would nonetheless be unreliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (identifying four non-exclusive factors that are helpful in assessing reliability). *See also Smesler v. Norfolk S. Ry. Co.*, 105 F.3d 299 (6th Cir. 1997) (adding a fifth factor to consider in weighing reliability, namely, whether an expert's opinion was developed expressly for purposes of litigation).

---

[7] This case is distinct from *In re Fosamax Products Liability Litigation*, 645 F.Supp.2d 164 (S.D.N.Y. 2009) where the court allowed an expert to testify regarding "general FDA regulatory requirements and procedures or offering an opinion as to Merck's compliance therewith." According to the court, "[a] lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry." Here, there is no "complex regulatory framework" underlying the standard of care in the ATV/UTV industry.

[8] Given this limitation, it is unclear how she can even speculate on Yamaha's obligations under § 15(b).

Downs's opinion that Yamaha acted contrary to the way a reasonably prudent manufacturer would is not supported by any reliable methodology. Her report is almost completely devoid of critical analysis, relying instead on conclusory statements that Yamaha should have alerted the CPSC sooner than it did. The "methodology" Downs claims she applied is that outlined in the Recall Handbook, a guidebook issued by the CPSC for manufacturers. However, Downs admits that the Handbook is a manual for firms to inform them of "their obligation to report under Section 15(b) of the CPSA." This reinforces the notion that Downs's opinion is really a § 15(b) opinion. Furthermore, Downs's testimony reveals that she relied on the Handbook methodology to a very limited extent. *See* R. 2370 at 11-14.

Although the *Daubert* factors are flexible, particularly in the case of non-scientific, experience-based experts, other courts have prohibited similar testimony. In *Hayes v. MTD Products, Inc.*, 518 F. Supp. 2d 898 (W.D. Ky. 2007) and *Campos v. MTD Products, Inc.*, 2009 WL 425012 (M.D. Tenn., Feb. 19, 2009), plaintiffs suing a lawnmower manufacturer offered the expert testimony of Stuart Statler, the former Commissioner of the CPSC.  According to Statler, his opinion was designed to inform the jury of "responsible manufacturing and marketing practices." The *Campos* court found his testimony unreliable, given that "Mr. Statler does not appear to be personally knowledgeable about the pros and cons of adding [a safety feature] to this particular type of mower." In *Hayes,* the court likewise found Statler's testimony unreliable, noting that "his expertise in this area is generic; in his report, Statler does not profess to be an expert on riding mowers but on 'consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous products by the [CPSC].'" This

dearth of experience led those courts to rule Mr. Statler's testimony unreliable. The logic of the opinions compels a similar conclusion here.

Furthermore, Downs's testimony would likely confuse the jury. In her report she opines on the obligations of a "prudent manufacturer," yet she has no experience in the off-road industry, nor can she even say whether the Rhino was defectively designed. Her report is a collection of generic statements about "manufacturers" generally and conclusions about whether Yamaha had a duty to report under § 15(b). Like the expert in *Campos*, Downs "seems to argue from the obvious, basic points that [the defendant] knew the risk of rollovers and did not install [appropriate safety controls.] [Her] report is devoid of the nuance and insight that would establish a credible, reliable, and helpful opinion." 2009 WL 425012 at *8. The question that juries will be asked in these cases is whether the Yamaha Rhino was defectively designed under the applicable state law, and it is one that Downs cannot help them to decide.

### f.  William Kitzes

Yamaha has moved to strike the testimony of William Kitzes. Kitzes is a former legal advisor at the Consumer Product Safety Commission who has worked on product safety issues since 1974. For the reasons discussed below, Yamaha's motion will be granted in part.

Kitzes works in the area of risk assessment and product safety management. Between 1974 and 1981, he worked as a legal advisor at the CPSC where he identified product defects and implemented corrective action plans under §15(b) of the CPSA.

Since then, Kitzes has worked as a consultant in safety performance, risk assessment and product safety management.

Kitzes offers a range of testimony in this case, and Yamaha objects to his testimony on a number of fronts. Yamaha groups his opinions into five categories: (i) opinions about the Rhino's warnings; (ii) opinions about a host of scientific-based matters such as biomechanics, engineering and off-road vehicle design; (iii) opinions about Yamaha's knowledge; (iv) opinions about Yamaha's alleged non-compliance with certain safety principles created by Kitzes; and (v) opinions about the Consumer Protection Safety Act ("CPSA") and CPSC regulations. For the reasons discussed below, the court will withhold ruling on Kitzes's warnings opinions, will permit his testimony on "scientific-based matters" and Yamaha's knowledge, but will prohibit him from testifying in regard to the CPSC.

First, Yamaha argues that Kitzes's opinions regarding warning labels are inadmissible because he never formulated or tested any alternative warnings.[9] This court will neither permit nor exclude Kitzes's warning label testimony. Although the Seventh Circuit has established a bright-line rule requiring alternative warnings and testing, *see Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 538 (7th Cir. 2000); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001), the other decisions cited by both parties suggest that this is merely one possible factor to consider. In *Brown v. Raymond Corp*, 432 F.3d 640 (6th Cir. 2005), the Sixth Circuit, reviewing a district court ruling for abuse of discretion, agreed that an expert who had failed to propose or test alternative

---

[9] Yamaha also objects that these opinions will not assist the jury. According to Yamaha, Kitzes's subjective opinions of the labels do nothing more than what any lawyer does in closing argument: argue to the jury that the labels are inadequate. R. 2369 at 9.

warnings could not testify. However, the court quoted the Seventh Circuit for the proposition that "conclusions based only on personal opinion and experience do not suffice," not for the proposition that all warnings experts must propose and test alternatives. Yamaha's attempts to distinguish *Stringer v. National Football League*, 749 F.Supp.2d 680, (S.D. Ohio 2009), and *Tassin v. Sears, Roebuck & Co.* , 946 F. Supp. 1241 (M.D. La. 1996) only undermine its argument that there is a bright-line rule requiring experts to propose and test alternative warnings. The court also acknowledges the plaintiffs' argument that differences in state substantive law can affect the relevance of expert testimony, even though the admissibility of the testimony is otherwise governed by the Federal Rules of Evidence. [10]

Here, Kitzes did not formulate alternative warnings; however, he compared the Rhino's actual warnings to the general ANSI guidelines. Based on this comparison, Kitzes concludes that the warnings were deficient. Contrary to Yamaha's contention, he does not simply formulate an off-the-cuff conclusion about the warnings that any juror could make. Rather, he explains why the particular characteristics of the Rhino make the specific warnings used insufficient in light of industry standards and academic research. Nonetheless, courts in the Seventh Circuit could find this insufficient. In

---

[10] Although not cited for this proposition, *Brown* is also relevant to the issue of whether state laws can affect relevance in cases governed by the Federal Rules. A different expert in *Brown* failed to offer an alternative forklift design. The Sixth Circuit noted that "The availability of alternative designs is relevant because it is an important factor to be considered in the risk-utility test articulated by the Tennessee Supreme Court in *Ray ex rel. Holman*." *Id.* at 647 (citations omitted).

addition, variances in state law could affect the relevance of this testimony. [11] Therefore, this court will permit the transferor courts to judge Kitzes's warning label testimony.

Second, Yamaha objects to Kitzes's opinions that require scientific expertise on the grounds that he is not qualified to render such opinions.[12] According to Yamaha, Kitzes's testimony regarding Yamaha's testing, its failure to install doors, and his suggestion that "people may get scared and put their feet out" are beyond his expertise.

The plaintiffs acknowledge that Kitzes is not an engineer or scientist. Further, Kitzes himself, who has an undergraduate degree in history and a law degree, readily admits that he cannot "comment at all on the quality of the engineering" in the Rhino, nor the quality of Yamaha's testing. The plaintiffs argue that Kitzes is not rendering any engineering opinions and that his "focus remains on Yamaha's approach to safety."

Kitzes does not offer any opinions that require an engineering background. He testifies that Yamaha had knowledge of the Rhino's danger given the number of incident reports it had received, as well as certain testing results. Nowhere does he propose to testify in the manner suggested by Yamaha. As for Yamaha's suggestion that Kitzes will testify regarding specific tests that it should have performed, it points to nothing that indicates he will testify in this manner. In fact, the testimony highlighted by Yamaha reveals that Kitzes finds information about testing relevant solely to the question of knowledge on the part of Yamaha. Similarly, his opinion with regard to the proposed doors is limited to the argument that they were considered, and thus that Yamaha was

---

[11] Although Yamaha complains that the issue of state law variance was raised "for the first time in [the plaintiffs'] supplemental brief," this was in keeping with the court's emphasis at the *Daubert* hearing on these concerns and its explicit request to raise such issues if they appeared.

[12] As a corollary, Yamaha also argues that certain of Kitze's opinions are inadmissible because they are within the ken of the average juror.

aware of the underlying safety concerns. If Kitzes attempts to venture beyond his expertise (or beyond his expert report) and into areas requiring an engineering background, the transferor court can prevent it.

Third, Yamaha objects to Kitzes's testimony regarding "what Yamaha knew and when." According to his report and deposition testimony, Kitzes will testify to what Yamaha "knew" based on a series of incident reports and engineering tests. Specifically, Kitzes concludes that Yamaha had knowledge of the Rhino's danger but avoided acting on its knowledge as would a reasonably prudent manufacturer. According to Yamaha, Kitzes's opinions are based exclusively on deposition testimony of Yamaha employees, which "can be admitted into evidence, and the trier of fact can review them and reach its own conclusions."

This testimony could be helpful to the jury and should be admitted. Kitzes's testimony could assist the jury by distilling disparate incident reports and analyzing how a large corporation such as Yamaha digests and processes such information. Kitzes can testify in this manner.

Fourth, Yamaha argues that Kitzes's testimony regarding his "Accepted Principles" is inadmissible because it is his own creation and the principles are not industry-wide standards. They also note that Kitzes concedes that Yamaha actually complied with three of his four principles.

Kitzes can testify regarding his safety principles. Although Kitzes may have been the first to state them in this specific manner, his "principles" are based on well-regarded publications in the area and are in actuality relatively generic statements, such as "identify product hazards and evaluate severity." To the extent they are not applicable to

27

Yamaha or they are unnecessary to design a safe product, Kitzes can be cross-examined on these shortcomings.

Fifth, Yamaha argues that Kitzes's opinion that it violated Section 15(b) of the CPSA is irrelevant, is based on a lack of reliable methodology, is a legal conclusion, and is prejudicial. As discussed in greater detail in the section dealing with Catherine Downs, testimony regarding Yamaha's compliance with the CPSA is prohibited. *See also Hayes v. MTD Products, Inc.*, 518 F. Supp. 2d 898 (W.D. Ky. 2007); *Campos v. MTD Products, Inc.*, 2009 WL 425012 (M.D. Tenn., Feb. 19, 2009) (finding generalized testimony regarding the CPSC unreliable).

### g. Ronald Carr

Yamaha also challenges the testimony of Ronald Carr. Yamaha does not challenge Carr's qualifications, but rather the reliability of a computer simulation that forms the basis for his opinions. For the reasons discussed below, this testimony is admissible.

Carr seeks to testify that certain Rhino accidents share several common characteristics. He bases his opinion on a series of computer simulations purporting to re-create several different Rhino incidents. According to Carr, this "remarkably common nature. . . tends to confirm the plaintiff engineering experts' general opinions concerning the Rhino's defective stability."

Carr's computer simulation is rooted in a program known as HVE-SIMON ("HVE"). HVE was created by Engineering Dynamics Corporation ("EDC") to simulate traditional on-road accidents. To accurately simulate the vastly different array of

28

vehicles available to consumers, EDC creates a program "model" for many different types of vehicles. For example, there are program models for the 2004 Jaguar S-Type sedan and for the 1982-1985 Toyota Celica. R. 2441 Exh. 10 at 3. Each of these models is calibrated using the features and specifications of the simulated vehicle.

Carr approached EDC about adapting the simulator to the Rhino for use in the present litigation. Although HVE had never been used to simulate an off-road vehicle, EDC agreed to help create the program. During the creation of the Rhino model, EDC sought a variety of information about the Rhino from Carr for use in creating the simulated version of the vehicle. As EDC recognizes, the "accuracy of any vehicle simulation software depends upon the accuracy of the data used to create the vehicles." R. 2507, Exh. A. With respect to the Rhino, certain variables were estimated. For instance, EDC recommended that a series of tests be run to get accurate tire data; however, this testing was never done. In addition, the release notes that accompany the Rhino model indicate that "exterior stiffness coefficients," "sprung mass rotational inertias," and "suspension front/rear ride rates" were estimated "because actual test data were not available."  Although a great many of the Rhino's components were measured, EDC ultimately expressed hesitation about the accuracy of the simulation's results "given that certain vehicle parameters remain unknown and EDC had to estimate them." R. 2372, Exh. K. Carr's decision to estimate these variables forms the crux of the present dispute.

Computer simulations are substantive evidence subject to *Daubert* reliability and relevance requirements. *See Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534 (D. Md. 2007) ("Computer simulations are treated as a form of scientific evidence, offered for a

substantive, rather than demonstrative purpose."). *See also Bullock v. Daimler Trucks North America, LLC*, 2011 WL 1656370 (D. Colo. May 03, 2011) ("Simulations are therefore usually classified as substantive evidence."). Courts analyzing computer simulations under *Daubert* ask whether the simulation has been tested, subjected to peer review, has a known error rate, and has general acceptance in the scientific community. *See Turner v. Liberty Mut. Fire Ins. Co.*, 2007 WL 2713062 (N.D.Ohio September 14, 2007). *See also Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579 (1993). However, courts also acknowledge that these factors do not always apply to computer simulations in the same way that they apply to typical expert testimony. *Livingston v. Isuzu Motors, Ltd.*, 910 F. Supp. 1473 (D. Mont. 1995).

Yamaha objects that Carr's Rhino model is unreliable under *Daubert*. According to Yamaha, the model has not been validated or tested, has no known error rate, has not been peer-reviewed, is not accepted in the scientific community, and was created specifically for the purposes of litigation. The appropriate inquiry, however, is whether the HVE suite passes *Daubert*'s reliability requirements. As described earlier, EDC has created HVE models for hundreds of different vehicles. It would make little sense to require each and every model to be tested, subjected to peer review, and gain general acceptance in the scientific community.[13] It is sufficient that HVE meets these requirements, and Yamaha agrees it does. R. 2507 at 4 ("Nowhere has Yamaha attacked the validity of the HVE-SIMON suite in general.").

---

[13] Neither is EDC's "disclaimer" of the reliability of the Rhino model dispositive. The relevance of the factors which led EDC to disclaim the Rhino model's results is discussed below.

30

Yamaha also criticizes Carr's validation of the Rhino model. Although not directly addressed by the parties, it appears that proper validation of a computer simulation is generally viewed as a component of the *Daubert* reliability inquiry. *See Turner*, 2007 WL 27130 (noting that the program had been validated in support of its conclusion that the software had been tested). Because validation is part of the reliability inquiry, the proper issue is whether *HVE* has been validated, not whether the Rhino model itself has been validated. HVE has been properly validated. *See* R. 2450 Exh. 8 (SAE paper on HVE-SIMON validation).

In addition to the traditional *Daubert* requirements of testing, peer-review, error-rate and general acceptance, Yamaha also argues that the simulated Rhino is unreliable because key inputs were estimated by Carr.[14] In support of this argument, Yamaha sponsored a third-party examination of Carr's simulation. This report is highly critical of Carr's simulation. Indeed, it notes a panoply of serious shortcomings with the Rhino model. However, the mere fact that an expert's opinion has flaws does not mean that the opinion is unreliable.

Courts have treated challenges to the data or inputs underlying a computer simulation in differing ways. Typically, where an expert seeks to testify regarding a

---

[14] Although Yamaha addresses these deficiencies in terms of reliability, it is not clear that that is the correct categorization. To the extent these deficiencies are relevant, they appear to be a component of the authentication requirement under Rule 901. Fed. R. Evid. 901. *Compare* 5 Federal Evidence § 9:26 (3d ed.2010) (requiring that the program be "based on assumptions and data that are consistent with the evidence in the case rather than speculation.") *with* 2 McCormick On Evid. § 218 (6th ed.) (requiring "sufficiency of the factual basis that serves as input, and its substantial similarity to the real event."); *Lorraine*, 241 F.R.D. at 560; *Bullock v. Daimler Trucks North America*, LLC, 2011 WL 1656370 at *4 (D. Colo. May 03, 2011). Because Yamaha nowhere challenges these data under Fed. R. Evid. 901, this court will not conduct an inquiry under that rule.

program or simulation that itself passes *Daubert*, an objection to the particular *inputs* utilized by the expert will not result in the testimony being stricken. In *Shadow Lake Management Co. Inc. v. Landmark American Ins. Co.*, 2008 WL 2510121 (E.D.La. June 17, 2008), the court noted that a computer program utilized by an expert was "commonly used" and "sufficiently reliable" and that "[t]he Defendant's concerns about the factual basis of [the expert's] reports and opinions are best resolved by vigorous cross-examination and the presentation of contrary evidence." Similarly, in *Phillips v. The Raymond Corp.*, the plaintiff challenged a computer simulation offered by the defendant's expert. The court held that "the miscalculations and inaccuracies Phillips contends he has identified go to the weight of the evidence and not its admissibility." In *Turner v. Williams,* the court considered a challenge to expert testimony regarding an accident-reconstruction program. 762 N.E.2d 70, 81-82 (Ill. App. 2001). According to the court, "[the expert] testified that the computer programs used, EDCRASH and EDSMAC4, are 'widely used and accepted in the field of crash analysis' . . . . In our view, the information used or not used by [the expert] was not a sufficient basis to bar his testimony. This issue could have been adequately brought to light before the jury on cross-examination." However, in *Reali v. Mazda Motor of America, Inc.*, the court concluded that a critical input into a computer simulation was "unreliable" and struck the testimony on that basis. 106 F. Supp. 2d 75 (D. Me. 2000).

*Montgomery v. Mitsubishi Motors Corp.*, a vehicle rollover case, is directly on point. 2006 WL 1310657 (E.D. Pa., May 12, 2006). In *Montgomery*, the plaintiff's expert prepared a computer simulation using HVE. However, while the accident occurred in a Mitsubishi Montero Sport, the expert utilized the Toyota 4Runner model. According to

the defendants, this testimony was inadmissible because it "[did] not reflect the facts of the case because [the expert] utilized entirely different vehicle makes and models in the HVE computer program and did not validate the accuracy of the outcome." *Id.* at *5. The defendants also noted that the expert "used inaccurate tire data on the model vehicle" and "failed to accurately model the other vehicle involved in the accident." The plaintiffs countered that the "most critical elements of the Montero Sport were captured."

The court in *Montgomery* held that the defendants' critiques did not go to the *reliability* of the expert's opinions, but to their weight. "While the use of specifications of a different vehicle altogether may not seem sensible, logical or compelling, the Court must focus on its role in this process – that is, the Court is not to pass judgment on an expert's choices in selecting data to use in a particular scientific or engineering model, but acts at this juncture as a gatekeeper." According to the court, "[t]he challenges that Mitsubishi raises with respect to the nature of the specifications utilized by Mr. Richardson do not, in their essence, attack the *reliability* of the data utilized. Rather, Mitsubishi challenges the *accuracy* of the data utilized." *Id.* at *7 (emphasis in original). The court therefore concluded that the issue was best left for the jury to decide.

The logic of *Montgomery* compels a similar result here. Yamaha's critiques of Carr's testimony do not go to its reliability. Yamaha nowhere suggests that the model is not accurately simulating the data and specifications entered by Carr. For instance, although Yamaha alleges that Carr used incorrect tire data, it does not allege that his model fails to adequately simulate tires with the specifications he selected. This challenge, and similar challenges, goes to the accuracy of the model, not its reliability. Although a computer program must pass *Daubert*, questions about the accuracy of the

33

data used as inputs into an otherwise reliable program are best left for cross examination.

Signed on September 6, 2011

Jennifer B. Coffman, Judge
United States District Court